730 A.2d 406 (1999)
322 N.J. Super. 74
BELL ATLANTIC NETWORK SERVICES, INC., a Delaware Corporation, Plaintiff-Respondent/ Cross-Appellant,
v.
P.M. VIDEO CORP., d/b/a AVIUS, a Delaware Corporation, Defendant/Third-Party Plaintiff-Appellant/Cross-Respondent,
v.
Honeywell Corporation, Square D Corporation, George A. Cretecos, Jr., Teletimer International, Inc., John G. Puma, and Eric Davidson, Third-Party Defendants,
and
Anthony W. Capuano and Bell Atlantic Corporation, Third-Party Defendant-Respondents/Cross-Appellants.
Superior Court of New Jersey, Appellate Division.
Argued March 30, 1999.
Decided June 11, 1999.
*409 Herbert J. Stern, Roseland, for defendant/third-party plaintiff-appellant/cross-respondent (Stern & Greenberg, and Stephen L. Snyder, Robert J. Weltchek, and Sheldon N. Jacobs (Snyder, Weiner, Weltchek, Vogelstein & Brown) of the Maryland bar, admitted pro hac vice, attorneys; Mr. Snyder, Mr. Weltchek, Mr. Stern, and Mr. Jacobs, of counsel and on the brief).
Theodore V. Wells, Jr., Roseland, for plaintiff-respondents/cross-appellants (Lowenstein Sandler, attorneys; Mr. Wells, Peter L. Skolnik, Melissa A. Rule, and Frank D. Stefanelli, of counsel; Mr. Wells, Mr. Skolnik, and R. Scott Thompson, on the brief).
Before Judges KEEFE, EICHEN, and COBURN. *407
*408 The opinion of the court was delivered by *410 COBURN, J.A.D.
Plaintiff[1] PMV Video Corp. ("PMV") alleged that it was induced by fraud to enter into an oral contract with defendants Bell Atlantic Network Services, Inc. ("BANS"), a subsidiary of Bell Atlantic Corporation ("Bell"), and sought to recover compensatory damages consisting of $375,000 in consulting fees, as provided in the agreement, projected lost profits of approximately $400 million dollars in this entirely new business venture, and punitive damages.
The case was tried twice. Before the first trial, on defendants' motion for summary judgment, the judge decided that the lost profits claim was barred by the "new business rule," Weiss v. Revenue Bldg. and Loan Ass'n, 116 N.J.L. 208, 182 A. 891 (E. & A.1936). He also found, apart from the rule, that the proofs offered by PMV were too speculative.
The first jury found defendants liable in fraud and awarded PMV $375,000 in compensatory damages and $25 million in punitive damages. The judge denied defendants' motion for judgment n.o.v. or a new trial on the fraud claim but granted them a new trial on punitive damages, subject to PMV's right to accept a remittitur of $3,125,000. PMV declined, and the second jury awarded it $1 million in punitive damages.
PMV appeals. With respect to the first trial, it contends the judge erred in disallowing the claim of approximately $400 million dollars in projected lost profits and in vacating the award of $25 million in punitive damages. Regarding the second trial, it contends the judge erred by permitting defendants to argue that they "had not committed any fraud" and by prohibiting the jury from considering the projected lost profits in calculating punitive damages. In short, what PMV now seeks is a judgment leaving untouched the $375,000 award, reinstating the $25 million punitive damage award, and a new trial on its $400 million lost profits claim; or, in the alternative, should we agree with the remittitur decision, a new trial on punitive damages.
The defendants cross-appeal. As to the first trial, they argue that the doctrine of judicial estoppel barred the fraud claim; that there was insufficient evidence to establish one of the elements of fraud, namely whether PMV reasonably relied on defendants' misrepresentations, thus warranting their request for judgment n.o.v.; and that PMV's display during summation of "highly prejudicial graphic material" mandated approval of defendants' motion for a new trial. With respect to both trials, defendants claim the evidence was insufficient, even if fraud was proved, to permit any consideration by the jury of punitive damages because their conduct was not egregious. They also argue that the corporate defendants should not have been assessed punitive damages because there was no evidence that any employee sufficiently high in authority participated in or ratified the conduct of defendant Anthony W. Capuano, the individual BANS employee with whom plaintiff negotiated.
As a preliminary matter, we take note of our obligation "to accept as true all evidence supporting the jury's verdict and to draw all reasonable inferences in its favor whenever reasonable minds could differ." Harper-Lawrence, Inc. v. United Merchants and Mfrs., Inc., 261 N.J.Super. 554, 559, 619 A.2d 623 (App.Div.1993) (citing Dolson v. Anastasia, 55 N.J. 2, 5, 258 *411 A.2d 706 (1969)). With that principle in mind, these are the facts.

I.
A full appreciation of plaintiff's case requires some discussion of the evidence bearing on the 1982 break-up of AT & T, the initial restrictions placed on regional Bell operating companies, and the lifting of those restrictions, a process begun in 1990.
In 1982, AT & T and the federal government entered into an agreement settling the government's long-running antitrust action against the Bell System. The agreement was the subject of a consent decree, which was itself an amendment of an earlier consent decree; hence, the amended consent decree and incorporated agreement are widely referred to as the "Modified Final Judgment" or "MFJ."
Under the terms of the MFJ, AT & T was required to divest itself of its local telephone companies. This divestiture occurred in 1984, and it led to the formation of seven "regional Bell operating companies," which are widely referred to as "RBOCs" or "Baby Bells." Bell was one of the RBOCs formed in 1984. By 1996, Bell had "about a hundred or more wholly owned subsidiaries," employed "in the neighborhood of 80 thousand" workers, and had an estimated net worth of more than $32 billion.
The MFJ imposed certain operating restrictions upon the RBOCs. For purposes of this appeal, the most important restriction was that the RBOCs were prohibited from providing information services.
Information services involve the processing of information that moves over telephone lines, but it does not include the actual transport of that information. Thus, a conversation over a telephone line is not an information service because "the information that you put in at one end is the same information that you get out at the other" end. However, if the conversation were recorded for later retrieval, that process would be an information service because it involves data processing and is "not just the carrying of information."
The effect of the MFJ was to confine the RBOCs to the minimally expanding local telephone business and to prohibit them from directly entering the potentially lucrative data processing businesses that were rapidly developing in the mid-to-late 1980s. The MFJ precluded the RBOCS from providing to their customers home automation, meaning the centralized control of such functions as heating, air conditioning, lighting, and security by a computerized panel.
In 1984, Congress enacted the Cable Communication Policy Act of 1984, Pub.L. No. 98-549, 98 Stat. 2779 (codified as amended at 47 U.S.C.A. §§ 521-559), which restricted the RBOCs from providing video-on-demand services to their customers. Video-on-demand involves sending "VCR quality video over existing telephone lines," rather than over a separate cable, as with cable television. With the video-on-demand service, the customer would have a wide choice of movies or recorded events to choose from and would be billed for each selection. The pay-per-view billing method currently employed by many cable companies is a "rudimentary form of video on demand," according to Capuano. Bell estimated in 1991 that if this statutory restriction could be lifted, video-on-demand services had a ten-year cumulative revenue potential of $8.2 billion. While the RBOCs apparently had a favorable court ruling on the restriction in 1993, the restriction was finally laid to rest in 1996 by a provision of the Telecommunications Act of 1996, Pub.L. No. 104-104, 110 Stat. 56 (codified in scattered sections of 47 U.S.C.A.).
As a result of the MFJ and the statutory cable restriction, during the 1980s and into the 1990s, the RBOCs (including Bell) could only indirectly offer information services or video-on-demand services to their customers by entering into a business relationship as a subcontractor to an information-service or video-on-demand provider.
*412 In such a relationship, the RBOCs could only be compensated for performing the services they were legally allowed to perform and could not share in the revenues derived from the provision of information or video-on-demand services. Because the RBOCs wanted to enter those business lines, they were thus compelled to seek third-party business partners who could provide the restricted services.
In January 1989, Bell announced that it had formed the PAL alliance with Teletimer International, Inc., and Square D Corporation. Honeywell Corporation soon joined the alliance. PAL was an acronym for "Personally Automated Lifestyles," and the object of the PAL alliance was to provide a variety of information services, especially those involving home automation, to the alliance's customers.
As envisioned by the alliance, the information services would actually be provided through a system of one national and seven regional "licensed systems integrators," also referred to as "LSIs," whose task would be the "tying together [of] energy management, security, lighting and appliance control, [as well as] some form of in-house communications and some form of in-house distribution of audio and video signals" for the alliance's customers. The seven regional LSIs were to be responsible for local sales, installation, and service, while the national LSI was to be responsible for creating and running the network.
One of the persons working to accomplish the PAL alliance's vision was defendant Anthony W. Capuano, who was employed in 1989 as the Managing Director of Home Automation with BANS, a wholly owned subsidiary of Bell. Capuano's quest to identify possible contenders for the available LSI positions soon led him to PMV.
PMV was formed, in 1982, by John Puma and Steve Meehan and was initially involved with servicing pay-TV accounts in Washington, D.C. It was an outgrowth of another corporation, PM Video Network, Inc., that Puma and Meehan had formed in 1980 to service pay-TV accounts in New England. To avoid the impression that PMV was merely "renting video tapes," Puma and Meehan often operated PMV under the trade name of "AVIUS," which was an acronym for automation voice and information unified systems.
From 1983 to 1989, PMV worked under a contract with MCI to install, service, and train technicians concerning MCI's "network access auto dialers." PMV's service territory extended from Connecticut to New Jersey, and the work involved "systems integration," whereby PMV would connect the customers' phone system into "the public network" by way of an MCI device. The MCI contract provided PMV with $7,000,000 to $8,000,000 in revenue overall, and PMV employed "about a hundred subcontractors and about twenty to twenty-five in-house personnel" during this period. Thus, PMV was a firm with a proven record of performance in systems integration. By 1989, Puma was apparently the sole owner of PMV.
On January 21, 1989, Puma attended the National Association of Home Builders convention in Atlanta, Georgia, where he saw the PAL alliance's exhibit and where he met George Cretecos of Teletimer, as well as Capuano and Capuano's subordinate Timothy Eggleston of BANS. Puma met with Capuano, Eggleston, and representatives from Square D, in March 1989, to make a presentation concerning the capabilities of PMV. He also met Capuano at a telecommunications conference in May 1989, where the two discussed the goals of the PAL alliance and dealer networks. According to Puma, Capuano told him "very clearly at that point in time that he wanted AVIUS [PMV] in the [PAL] program."
In July 1989, Eggleston and representatives from Square D visited PMV's offices in Fairfield, New Jersey. They observed PMV's performance of tasks under the MCI contract and went to several of the *413 home sites that PMV had wired with home automation devices.
On January 20 and 21, 1990, Puma attended another National Association of Home Builders convention in Atlanta and saw Capuano at a prearranged meeting. According to Puma, Capuano told him that PMV had been awarded one of the regional LSI positions and would have responsibility for sales, service, installation, and customer relations within that region. Puma testified that Capuano did not state that the award of the unspecified regional LSI to PMV was subject to conditions or contingencies, but he did indicate that the regional LSI would receive a "hundred million dollars" a year in revenue over a ten-year period. Capuano also told him that PMV had to "beef up" its marketing prowess to become eligible for the national LSI position. Capuano suggested that Puma hire a mutual business acquaintance, Eric Davidson of Smart House, Inc. Puma and Davidson had previously discussed joining together to pursue mutual business interests, including "contracts with Bell Atlantic."
On April 3, 1990, the United States Court of Appeals for the District of Columbia issued a decision in an appeal by various RBOCs, including Bell, that remanded part of the 1984 divestiture MFJ to the district court and essentially directed the district court "to approve getting rid of or dropping the information services line of business restriction" on the RBOCs. See United States v. Western Elec. Co., 900 F.2d 283 (D.C.Cir.), cert. denied, 498 U.S. 911, 111 S.Ct. 283, 112 L.Ed.2d 238 (1990). This court decision was widely reported and understood to mean that the RBOCs would soon be permitted to enter business fields involving information services from which they had earlier been excluded. Fifteen months later, on July 25, 1991, the federal district court entered the anticipated order removing the restrictions on information services. United States v. Western Elec. Co., 767 F.Supp. 308 (D.D.C. 1991), aff'd, 993 F.2d 1572 (D.C.Cir.), cert. denied, 510 U.S. 984, 114 S.Ct. 487, 126 L.Ed.2d 438 (1993).
On April 27, 1990, in reaction to the federal appeals court's decision of April 3, 1990, Bell's highest management met and reviewed plans for Bell's entry as a competitor without partners into the information services and home automation marketplace. Capuano participated in the preparation of materials for that meeting, and those materials plainly called for Bell itself to provide information services that had been earlier earmarked as tasks for the regional and national LSIs.
On April 29, 1990, Capuano met with Puma and Davidson, and, according to Puma, told them that PMV had the national LSI position and the regional LSI position for the region serviced by the RBOC NYNEX. The contract awards were unconditional. Puma testified that he believed Capuano had the authority to make these agreements because Capuano "was the biggest guy in the industry at that point in time" and the PAL alliance was "the most powerful group in the industry." Capuano made a diagram of the prospective business relationship. In the diagram, "John [Puma] & Eric [Davidson]" were set out in a national LSI box above the "7 Guys" who were to be the regional LSIs, and the PAL alliance was also prominently displayed in the business schematic.
Capuano's version of what occurred at the meeting was substantially different from that of Puma. Essentially, Capuano testified that he outlined a three-phase business plan to Puma and Davidson, and that each phase was subject to conditions and to approval by his superiors at BANS and Bell. Capuano said that he never entered into contract negotiations with PMV concerning the national or regional LSI positions.
Capuano's testimony, however, conflicted with that of a businessman unrelated to PMV, Sean Walsh of Hometron, Inc., a competitor of PMV. He said that Capuano informed him that PMV had been unconditionally *414 awarded the national LSI position. Although Capuano testified that he told Walsh only that he was going to recommend PMV for the national LSI position, the jury was entitled to credit Puma and Walsh and reject the contrary recollections of Capuano.[2]
On May 3, 1990, Puma mailed a letter with attached documents to Capuano describing his understanding of the three-phase agreement between BANS and PMV. Capuano explained at trial that he interpreted the letter and its attachments as a consultancy agreement for the first phase of the agreement, not as a recitation of the existence of the entire three-phase agreement.
In late May 1990, after Capuano promised the national LSI position to PMV, Davidson resigned from his position at Smart House and began working for PMV. Over the following four months, Puma and Davidson spoke and met with Capuano and Eggleston often to discuss plans for the regional LSI.
From June 1 to 3, 1990, Capuano attended a consumer electronics show in Chicago, which Puma and Davidson also attended. The three met and, according to Puma, "hammered out the deal that we still have today." Puma testified that the first phase of the agreement called for PMV's production of an outline of its national marketing plan for the PAL products. The outline would include PMV's "proprietary information," which Puma testified "took me ten years to develop," and for which BANS agreed to make an initial payment of $25,000; but Puma reserved PMV's right to the proprietary information, refusing to convey those rights to BANS under the first phase.
Puma testified that the second phase of the agreement called for PMV's production of the final version of the national plan, PMV's active participation in the plan as a consultant, and PMV's conveyance of its proprietary information to BANS. PMV was to be paid $350,000 for the proprietary information conveyed to BANS under the second phase.
According to Puma, the third phase of the agreement entailed the implementation of the national plan, including the formation of the national LSI company with PMV as majority owner, as well as Bell's funding of that national company.
On June 6, 1990, Puma and Davidson met with Capuano and executed nondisclosure documents. On June 16, PMV sent the initial "National Channel Development for Bell Atlantic" document in fulfillment of Phase One of the agreement. On June 19, PMV forwarded additional financial information to Capuano, further explaining the plan.
On June 18, 1990, while PMV was working on the second phase of the agreement, Capuano wrote to his superior in the corporate hierarchy at BANS, Thomas Gorman. Discussing the role of PMV and another company who were viewed as "consultants" by Capuano, he reported that "we will leverage the consultants' knowledge about Home Automation in technical and marketing related areas (task descriptions follow) to provide necessary experience for BAC [Bell] to carry out these tasks in the future." This letter reflects Capuano's awareness that Bell was not seeking partners at that time in its prospective marketing of information services.
On July 10, 1990, Capuano and Puma spoke on the telephone. According to Puma, Capuano said that Bell had approved a ten-year, $118,000,000 investment in the national LSI company. Puma also testified that Capuano did not at that time indicate that there were any "snags," "problems," or conditions to Bell's performance under the three-phase agreement. Subsequently, PMV received financial projections *415 from Bell concerning the anticipated revenue and net income for the national LSI company and the regional LSIs.
On July 13, 1990, PMV delivered to Capuano what amounted to the final report due under Phase Two of the three-phase agreement: "The National Channel Development for Bell Atlantic." The report evidently contained much of PMV's proprietary information. Puma and PMV continued to work on the consultancy portion of Phase Two after delivering the final report, responding to all inquiries by Bell.
On July 27, 1990, according to Capuano, his boss's superior, John Seazholtz vetoed the idea of Bell investing in small outside companies like PMV and decided that the national LSI would be run by Bell.
On August 2, 1990, according to Sean Walsh of Hometron, Capuano told him "on the QT" that Bell would be the national LSI. Walsh also testified that Bell had reneged on a contract with him that Hometron would have an equity interest in the regional LSI position for which it had been chosen; instead, Bell would totally own all of the regional LSIs. Capuano, however, denied that he had made the comment to Walsh concerning the national LSI position.
Also, on August 2, Geoffrey Harton of BANS sent a standard Bell consultancy contract to Puma as a prelude to Bell's payment of PMV for its services. The contract contained $15,000 and $10,000 total-payment provisions and a "Developed Information" provision that Puma found confusing, baffling, and preposterous. Puma did not execute or return the contract to Harton but, instead, considered it a "mix up" after speaking to Harton about it. Puma then continued to do the Phase Two consultancy work pursuant to the three-phase agreement.
On September 6, 1990, Puma and Davidson travelled to Bell's offices in Silver Spring, Maryland, to confer with Capuano about some bills that Bell had not paid. At the meeting, Capuano informed the two that Bell would "not make an investment in an outside" national LSI company, "that there was going to be no investment in AVIUS [PMV]," and that "Bell Atlantic was going to do the job themselves." According to Capuano, he had already told Puma this on August 13. Puma testified that he was "shocked" and "nauseous" at this turn of events because he had worked without any compensation for "virtually the entire summer, [and for] a great deal of time before that." Capuano did not cut PMV off completely, however. Instead, while "Bell Atlantic would be the national [LSI] and would execute the plan," Bell would provide PMV with the "functional financial equivalent" of the national LSI position. Puma decided that if Capuano's alternate proposal proved to be the monetary equivalent of the national LSI position, then "it would be prudent for me to just go along" with Capuano until the alternative proposal was made concrete. The meeting ended with many unresolved issues.
On September 10, 1990, Capuano sent Puma a letter suggesting three "major potential opportunity areas" for PMV to work with the PAL alliance. These "areas" were largely undefined in Capuano's letter, and, though Puma really did not know the parameters of these opportunities, he stated that he would have been willing to accept Bell's alternative. But, according to Puma, Capuano "didn't deliver anything" on this supposed alternative to the original deal. Nevertheless, Puma took Capuano's "letter as a positive step," and he resolved to enter into any favorable contracts with Bell that he could. Puma testified that he was "very, very nervous" at this time because "I had a company [PMV] to run, I had families to feed and I had no work, I had just spent the entire past six months working for him [Capuano], and not working for P.M. Video."
On September 25, 1990, Puma and Davidson traveled to Bell's offices in Silver Spring, where they met with Capuano and *416 Eggelston. Puma testified that his purpose in attending the meeting was "to take that September 10th letter [from Capuano] and articulate it in as great detail as possible, create an agreement that would be executed spontaneously and get money for the work that I had done." As a result of their discussions, Capuano directed Puma "to take the notes that we had taken at the meeting, reduce it into a formal letter and submit it to him." On October 18, 1990, Puma sent Capuano a letter detailing PMV's proposal for an alternative contract with Bell.
Capuano testified that he considered Puma's letter to be an "extortion letter," and he countered with a letter on October 29, 1990, "to clarify our relationship to date and outline future possibilities." In that letter, Capuano stated that PMV had only been hired as a consultant under an oral contract to "produce a quick preliminary study" for $25,000, and that the "study was based almost entirely on Bell Atlantic proprietary information and concepts developed internally by Bell Atlantic which were provided to you under a non-disclosure agreement." Capuano offered to pay PMV the $25,000 that he said was owing if Puma executed a concurrence that Capuano's letter recited the true scope of the business relationship between PMV and Bell or, alternatively, if Puma signed the consulting contract that Harton of BANS had sent him on August 21, 1990.
Puma refused Capuano's offer and sought legal counsel. Puma testified that Capuano's offer was "ridiculous" because "this was like having a gun to my head. I wasn't going to give them my work that took me ten years to develop for twenty-five thousand dollars. That's not what the deal was."
About a year later, on October 31, 1991, Capuano's superior at BANS, Gorman, sent a letter to his superior, John Seazholtz, discussing the various contracts entered into by the Home Automation Group headed by Capuano. Gorman wrote that
[i]n all cases but one, we reviewed the proposed relationships beforehand with legal, contracting and, if necessary, with Bell Atlantic's senior management.
The one exception to this rule was an oral contract which Mr. Capuano made with a company called Avius [PMV] to develop some data for our business development plan. This agreement is now the subject of litigation, and while the claims being made by Avius are regarded by our lawyers and outside counsel as completely unfounded, Mr. Capuano accepts full responsibility for stepping outside the rules in this instance in order to meet a presentation deadline.
Following the termination of its relations with PMV, Bell explored the possibility of entering the home automation market on a nationwide basis either in combination with the other RBOCs or alone. Bell's plan, "Project Domotique," was estimated in November 1991 to be capable of producing approximately $523,000,000 in net operating revenue by the year 2000, but those revenues were never realized. Bell's entire home automation plan was "killed" and Capuano's unit was disbanded in May 1992, when it came under the purview of a new senior manager at BANS.
As for Bell's video-on-demand plan, there was no proof that it was anything other than an experimental program by the time of trial and no evidence that it ever achieved any profits.

II.

JUDICIAL ESTOPPEL
This lawsuit was preceded by an action PMV filed against Bell, and other defendants, in the United States District Court for the Eastern District of New York. Based on the same circumstances, that action alleged breach of contract. It was quickly dismissed for lack of diversity jurisdiction because PMV and Bell were both Delaware corporations. Nonetheless, Bell sought an order in the Law Division prohibiting *417 PMV "from attempting to prove at trial any version of a three-phase agreement with the Bell Defendants other than that which it alleged in the [federal] complaint...."
In their appellate brief, defendants explain their position in the following manner:
[PMV] has played fast and loose with many facts central to this case. Perhaps most critically, [PMV] has taken inconsistent positions about when "phase one" ended and "phase two" began. In its verified federal complaint ... [PMV] claimed phase one ended and ... [it] delivered a phase one report on July 14, 1990. But thereafter, in [PMV's] New Jersey counterclaims ..., [it] claims phase one ended on June 16, 1990, and that it was the phase two report delivered on July 14.
It is a change of great consequence because only by claiming that it completed the phase two report can [PMV] argue that it deserves the $350,000 in compensatory damages for the phase two report, and that by completing phase two it thereby completed a necessary condition precedent to establishing liability for the enormous damages it claims for phase three.
[Footnote omitted.]
Generally, the doctrine of judicial estoppel "bar[s] a party to a legal proceeding from arguing a position inconsistent with one previously asserted." N.M. v. J.G., 255 N.J.Super. 423, 429, 605 A.2d 709 (App.Div.1992). It is most often applied when a party takes inconsistent positions in different litigation; however, it is equally applicable where a party asserts inconsistent legal positions in different proceedings in the same litigation. Cummings v. Bahr, 295 N.J.Super. 374, 385, 685 A.2d 60 (App.Div.1996).
But the doctrine is only applicable when the party against whom it is to be applied "successfully asserted" the inconsistent position in the prior proceeding. Id. at 387, 685 A.2d 60. A position has been "successfully asserted"
if it has helped form the basis of a judicial determination. The judicial determination does not have to be in favor of the party making the assertion. If a court has based a final decision, even in part, on a party's assertion, that same party is thereafter precluded from asserting a contradictory position.
[Id. at 387-88, 685 A.2d 60.]
These principles demonstrate that the doctrine of judicial estoppel is inapplicable. PMV did not "successfully assert" its legal position concerning the disputed Phase One and Phase Two dates in the federal action because those disputed dates were not the basis of the judicial determination ending the litigation. Instead, the dismissal of the federal action turned solely on the lack of diversity jurisdiction.

III.

DEFENDANTS' MOTION FOR JUDGMENT N.O.V.
At the end of the first trial, defendants moved for judgment notwithstanding the verdict on the ground that one element of fraud, reasonable reliance, had not been proven. We disagree.
An action for common-law fraud requires proof of five elements: "(1) a material misrepresentation of a presently existing or past fact; (2) knowledge or belief by the defendant of its falsity; (3) an intention that the other person rely on it; (4) reasonable reliance thereon by the other person; and (5) resulting damages." Gennari v. Weichert Co. Realtors, 148 N.J. 582, 610, 691 A.2d 350 (1997). Included within the first element are promises made without the intent to perform since they are "material misrepresentations of the promisor's state of mind at the time of the promise." Dover Shopping Center, Inc. v. Cushman's Sons, Inc., 63 N.J.Super. 384, 391, 164 A.2d 785 (App.Div.1960); accord *418 Lipsit v. Leonard, 64 N.J. 276, 283, 315 A.2d 25 (1974).
Implicit in defendants' argument for judgment n.o.v. was the admission that all but one of the elements of common-law fraud were adequately supported by the evidence. In other words, at least for purposes of this argument, defendants must be understood as conceding that their promise was a material misrepresentation of a presently existing fact; that it was made with knowledge or belief in its falsity; that they intended that PMV rely on it; and that PMV was damaged as a result of it.
Given that understanding, defendants' argument, which is based on the contention that the initial promise was contingent on later Bell approvals, was properly rejected since, as the trial judge noted, there was credible evidence "[t]hat before Mr. Puma [the president of PMV] did any work the [Bell] defendants unconditionally promised him a national business network in order to obtain his [PMV's] work product." (Emphasis added.)

IV.

DEFENDANTS' MOTION FOR A NEW TRIAL
During summation in the first trial, plaintiff's attorney displayed two drawings to the jury. The first depicted Bell's chairman in royal attire, including a crown. He, Capuano, Puma, and others were seated at a table laden with food. The second drawing showed the chairman alone at the table with all the food gathered before him. While displaying these drawings, plaintiff's attorney said:
And we've created our own graph[ics] and ... this is another one of our inventions to show you what we think about Bell.... This is Bell Atlantic's meal ticket. These are all the players on the right .... all that food is being distributed equally. And if you'll turn the page, look what happens. Everybody is gone. All that food is in front of Ray Smith [the chairman]. Tony Capuano is even gone. That's how we perceive what happened here with the use of a graph[ic].
Members of the jury, I want you to enjoy them but, you know, we're all serious, very serious about this case and the allegations. This was an agenda at the highest level on a project that involved billions of dollars, billions of revenues to Bell. A project that would allow them with relief, to do things on their own without partners, exactly what they're doing today. For Mr. Smith to suggest to you under oath that he knows very little about this, when the evidence shows to the contrary, it's an absurdity. It's an attack on your intelligence. And you should not accept it.
During trial, defendants neither objected to the comments nor to the display of the drawings. In fact, their first objection on this point "surfaced" in their brief in support of their motion for a new trial, and it was contained in one of eighty-six footnotes to that brief.
Since the presentation of this argument in the trial court was untimely, we must consider the issue under the plain error rule. Nisivoccia v. Ademhill Assocs., 286 N.J.Super. 419, 424, 669 A.2d 822 (App.Div.1996) ("Inasmuch as plaintiffs' motion for a new trial expressed their first objection to the defense attorney's summation remarks, we will consider the present appeal under the plain error standard. See R. 2:10-2."). With that in mind, we reject the argument. While the drawings may have had some potential for prejudice, they were only metaphors, and they were not clearly capable of producing an unjust result.

V.

PLAINTIFF'S PROJECTED LOST PROFITS CLAIM
PMV alleged that as a result of the defendants' fraudulent conduct it suffered *419 hundreds of millions of dollars in lost profits. Defendants responded with a motion for summary judgment, asserting the claim was barred by the "new business rule." Weiss v. Revenue Bldg. and Loan Ass'n, 116 N.J.L. 208, 212, 182 A. 891 (E. & A.1936). Alternatively, defendants argued that even if New Jersey no longer follows that rule, the damage claims were too speculative for consideration by a jury. The trial judge granted defendants' motion, finding that the "new business rule" was the law in this state, and that if it was not, the plaintiff's proofs were still too speculative. We agree with the judge on both rulings.
In Weiss, the Court of Errors and Appeals described the "new business rule" in this manner:
There is a well established distinction, in respect of the ascertainment of future probable profits, between a new business or venture and one in actual operation. In the first, the prospective profits are too remote, contingent and speculative to meet the legal standard of reasonable certainty; while in the second, the provable data furnished by actual experience provides the basis for an estimation of the quantum of such profits with a satisfactory degree of definiteness.
[Ibid.]
The "new business rule" was rejected as a statement of the law of New Jersey by the Third Circuit in In re Merritt Logan, Inc., 901 F.2d 349, 357 (3d Cir.1990). After noting the modern trend towards rejection of this once generally accepted rule, the court predicted that the New Jersey Supreme Court, given the chance, would "no longer follow a per se rule precluding all new businesses from recovering any damages for lost profits." Ibid.
In Perini Corp. v. Greate Bay Hotel & Casino, Inc., 129 N.J. 479, 610 A.2d 364 (1992), the Supreme Court reviewed an arbitration award for lost profits incurred by a new business. The three-justice plurality addressed the issue in the following manner:
Perini[, the general contractor,] argues that the renovation project amounted to a new business. In Weiss v. Revenue Building and Loan Ass'n, 116 N.J.L. 208, 182 A.2d [A.] 891 (E. & A.1936), the Court stated that lost profits for a new business are "too remote, contingent and speculative to meet the legal standard of reasonable certainty." Id. at 212, 182 A. 891. Sands[, the casino,] questions that argument. It points out that the casino had a proven track record; the location and nature of the business never changed; and the management team never changed.
However, even were we to consider profits from the 1984 season as those of a new business, the trend in recent cases has been to award lost profits for a new business when they can be proved with reasonable certainty. Robert L. Dunn, Recovery of Damages for Lost Profits, § 4.2 (3d ed.1987); see also Seaman [v. United States Steel Corp.], supra, 166 N.J.Super. [467] at 474-75, 400 A.2d 90 [(1979)] (evidence of lost rental value from new operation incorrectly admitted at trial because, among other things, defendant failed to show that a profit would have been made). In In re Merritt Logan, Inc., 901 F.2d 349 (3d Cir. 1990), the court predicted that this Court would follow that trend and allow lost profits for a new business if damages were proved with reasonable certainty. Id. at 358. That court also relied on comment 2 to N.J.S.A. 12A:2-708(2)(UCC), which states that "[i]t is not necessary to a recovery of `profit' to show a history of earnings, especially if a new venture is involved." Ibid. Given that recent trend, the arbitrators cannot be said to have acted in manifest disregard of the law. Thus, because the arbitrators were presented with enough evidence to decide that Sands had proved its lost profits damages with reasonable *420 certainty, the damage award does not fall.
[Id. at 509-10, 610 A.2d 364.]
No other justice joined these remarks.
A year later, the Third Circuit, citing Merritt Logan and Perini, said, "New Jersey no longer adheres to its `new business rule....'" Lightning Lube, Inc. v. Witco Corp., 4 F.3d 1153, 1176 (3d Cir. 1993). A decision of the Third Circuit is entitled to "due respect," but it is not binding on the state courts. See Dewey v. R.J. Reynolds Tobacco Co., 121 N.J. 69, 79-80, 577 A.2d 1239 (1990). Furthermore, the court in Lightning Lube did not actually find that New Jersey had abandoned the "new business rule." As in Merritt Logan, the court was making a prediction of the course the New Jersey Supreme Court would follow if presented with the issue. The court said, "While we recognize that Perini involved damages awarded in an arbitration," we believe that the Supreme Court of New Jersey would apply its holding to trials in court as well. Lightning Lube, supra, 4 F.3d at 1176 (emphasis added).
The only exception to the rule that we are bound by decisions of the Supreme Court and the Court of Errors and Appeals is where "more recent decisions of the Supreme Court clearly undermine the authority of a prior decision, although not expressly overruling it." Burrell v. Quaranta, 259 N.J.Super. 243, 252, 612 A.2d 379 (App.Div.1992) (emphasis added). While the arguments for abandonment of the "new business rule" appear to be persuasive, those arguments are not supported by a majority opinion of the Supreme Court; rather, they appear only in the plurality opinion in Perini. That is not a sufficient basis for us to say that Perini, which only involved arbitration and was itself overruled on other grounds in Tretina Printing, Inc. v. Fitzpatrick & Assocs., 135 N.J. 349, 358-59, 640 A.2d 788 (1994), clearly undermined the authority of Weiss.
Plaintiff also argues that the "new business rule" is limited to contract actions and is inapplicable to fraud. But that is not so. See, e.g., Kurtz v. Oremland, 33 N.J.Super. 443, 451-53, 111 A.2d 100 (Ch. Div.), aff'd o.b., 16 N.J. 454, 109 A.2d 286 (1954).
In view of the possibility that our Supreme Court might overrule the "new business rule," the trial judge also considered whether PMV's lost profit claim was too speculative despite the opinions offered by its economic experts. In rejecting the claim on the ground that the evidence of lost profits could not be established with reasonable certainty, the trial judge emphasized the following points: (1) the substantial discrepancy between the projections of PMV's two experts, one putting the loss, as of 1995, at $410 million and the other putting the loss, as of the same date, at $288 million, a difference of $112 million; (2) the national LSI company never came into existence; (3) the national LSI concept was contingent on the development of a complex network of interlocking companies, none of which has been created; (4) the profitability of the national LSI would have depended on the formation of numerous collateral agreements with independent service providers and their agreement to accept PMV's demands for set percentages of each provider's revenue stream; (5) the business plan was unique and untested; (6) the products, home automation and video-on-demand, were new and both industries were "still in a very preliminary planning stage and [were] years away from the mass-marketing penetration that PM[V] envision[ed]"; and (7) PMV's experts had relied almost exclusively on projections made by Bell while ignoring the numerous caveats, contingencies, and assumptions contained in the Bell financial projections, which detailed the risk and uncertainty of the proposed business concept. The trial judge also concluded that "[g]iven the substantial start-up costs associated with these projects, the future *421 profitability of home automation products and related services is far from certain."
Assuming the inapplicability of the "new business rule," PMV was still required to prove its alleged lost profits with "reasonable certainty." See, e.g., Advent Sys. Ltd. v. Unisys Corp., 925 F.2d 670, 680-81 (3d Cir.1991) (explaining the standard under Pennsylvania law). None of the cases cited by plaintiff even approximate the degree of speculation involved in this case. Here, we are dealing with new, highly innovative products whose reception by the public was doubtful, to say the least. Adding to that consideration the enormous complexity of the multiple business relationships required for successful marketing, we are satisfied that the trial judge correctly relied on these views expressed by the Supreme Court of Texas in Texas Instruments, Inc. v. Teletron Energy Management, Inc., 877 S.W.2d 276 (Tex.1994):
Profits which are largely speculative, as from an activity dependent on uncertain or changing market conditions, or on chancy business opportunities, or on promotion of untested products or entry into unknown or unviable markets, or the success of a new and unproved enterprise, cannot be recovered. Factors like these and others which make a business venture risky in prospect preclude recovery of lost profits in retrospect.
The fact that a business is new is but one consideration in applying the "reasonable certainty" test.... [But t]he mere hope for success of an untried enterprise, even when that hope is realistic, is not enough for recovery of lost profits. When there are firmer reasons to expect a business to yield a profit, the enterprise is not prohibited from recovering merely because it is new.
[Id. at 279-80.]
Consequently, we see no basis for disturbing the trial judge's determination that plaintiff's proofs were too speculative to permit their consideration by a jury. See generally Roger I. Abrams, Donald Welsch, & Bruce Jonas, Stillborn Enterprises: Calculating Expectation Damages Using Forensic Economics, 57 Ohio St. L.J. 809 (1996) (criticizing the "new business rule" and indicating the proofs, not present here, that are needed to support this kind of claim). As those authors concluded, "The key judicial finding [is] the market viability of the stillborn enterprise." Id. at 834. In essence, the trial judge found that plaintiff had failed to establish the "market viability" of the proposed business.

VI.

THE PUNITIVE DAMAGE CLAIMS
Under this heading, we consider these arguments: (1) defendants' contention that their conduct was not egregious enough to warrant punitive damages; (2) their related contention that there was insufficient involvement in the fraud by upper management to permit an award of punitive damages against the Bell corporations; (3) plaintiff's contention that the judge erred in vacating the $25 million punitive damage award given by the first jury; and (4) plaintiff's alternative arguments for a new trial on punitive damages.
A. Defendants' Argument that the Evidence did not Warrant Punitive Damages
At the close of all the evidence in the first phase of the first trial, defendants moved, pursuant to R. 4:40-1, for judgment dismissing the punitive damages claim. They argued that there was insufficient evidence of egregious conduct. The motion was denied. The jury found defendants liable for $375,000 in compensatory damages and for punitive damages in an amount to be set at the second phase. On April 12, 1996, the jury returned its verdict for $25 million in punitive damages. Subsequently, defendants moved for judgment n.o.v. on the punitive damage claim, again *422 asserting that their conduct was not sufficiently egregious to warrant such relief.
Defendants rely on the principle that "[e]very fraud is reprehensible, but not every fraud ... warrants punitive damages." Jugan v. Friedman, 275 N.J.Super. 556, 572, 646 A.2d 1112 (App.Div.), certif. denied, 138 N.J. 271, 649 A.2d 1291 (1994).
In Nappe v. Anschelewitz, Barr, Ansell & Bonello, 97 N.J. 37, 477 A.2d 1224 (1984), the Supreme Court explained when punitive damages would be justified:
To warrant a punitive award, the defendant's conduct must have been wantonly reckless or malicious. There must be an intentional wrongdoing in the sense of an "evil-minded act" or an act accompanied by a wanton and wilful disregard of the rights of another. DiGiovanni v. Pessel, supra, 55 N.J. [188] at 191 [260 A.2d 510 (1970)]. In Berg v. Reaction Motors Div., supra, 37 N.J. [396] at 414 [181 A.2d 487 (1962)], this Court said:
Professor McCormick suggests that in order to satisfy the requirement of willfulness or wantonness there must be a "positive element of conscious wrongdoing." See McCormick, supra, at p. 280. Our cases indicate that the requirement may be satisfied upon a showing that there has been a deliberate act or omission with knowledge of a high degree of probability of harm and reckless indifference to consequences. See King v. Patrylow, 15 N.J.Super. 429, 433 [83 A.2d 639] (App.Div.1951); cf. Krauth v. Israel Geller and Buckingham Homes, Inc., 31 N.J. 270, 277 [157 A.2d 129] (1960); Egan v. Erie R. Co., 29 N.J. 243, 255 [148 A.2d 830] (1959); Tidewater Oil Co. v. Camden Securities Co., 49 N.J.Super. 155, 164 [139 A.2d 318] (Ch.Div.1958). See also Staub v. Public Service Railway Co., 97 N.J.L. 297, 300 [117 A. 48] (E & A.1922).
The key to the right to punitive damages is the wrongfulness of the intentional act. "The right to award exemplary damages primarily rests upon the single groundwrongful motive * * *." Dreimuller v. Rogow, supra, 93 N.J.L. [1] at 3 [107 A. 144 (1919)]; see also Trainer v. Wolff, 58 N.J.L. 381 [33 A. 1051] (E. & A. 1895).
[Id. at 49, 477 A.2d 1224.]
The defendants argue the "evidence showed, at worst, that Bell Atlantic's conduct was motivated by a desire to make large profits for itself, not any ill will towards or desire to harm [PMV]." In other words, they contend the evidence failed to demonstrate that Bell had a "wrongful motive." Nappe, supra, 97 N.J. at 49, 477 A.2d 1224. But that argument ignores the evidence that Capuano, as a result of the April 27, 1990, executive meeting, knew that Bell intended to enter the home automation and information services businesses itself, to the exclusion of PMV, and yet thereafter persisted in representing to PMV that it would be the national LSI and a regional LSI. It also ignores the letter of June 18, 1990, from Capuano to his supervisor, which the jury could well have understood as reflecting defendants' consistent intent to unfairly benefit from PMV's proprietary information, despite that PMV only turned over the information on the understanding that it would have the LSI positions.[3]
Relying on Fischer v. Johns-Manville, 103 N.J. 643, 512 A.2d 466 (1986), defendants argue that punitive damages can only be awarded where there have been "repeated instances of misconduct, with knowledge that there was a `high probability' of `substantial injury.'" They then assert that here the jury found only one act of misconduct with minimal injury.
*423 Fischer, supra, a products liability case, does not stand for the proposition suggestedit does not require "repeated" instances of misconduct. 103 N.J. at 673, 512 A.2d 466. To the contrary, it accepts the law of fraud and punitive damages as laid down in Nappe. Id. at 655, 673, 512 A.2d 466 (citing Nappe, supra, 97 N.J. at 49-50, 477 A.2d 1224). Furthermore, in this case the misconduct was carried on by Capuano over a period of some five months, during which time he continued to obtain, on behalf of his employer, the benefit of PMV's efforts, while knowing that Bell had no intention of consummating the LSI deals. Thus, viewing the evidence from the plaintiff's point of view, as we must, there were repeated instances of misconduct.
Even if we were to accept the proposition offered by Bell, that it did not act with an "evil mind," which we do not, there was, nonetheless, more than sufficient evidence to show that the repeated acts of Capuano were accompanied by a wanton and willful disregard of PMV's right to profit from its propriety information and from the efforts of its employees. Therefore, punitive damages were warranted under Nappe.
B. Defendants' Argument Against Corporate Liability for Punitive Damages
We turn next to defendants' contention that the corporate defendants should not have been found liable for punitive damages because executives were not involved in the fraud and because the corporations did not ratify Capuano's fraudulent acts. This argument, raised for the first time in defendants' motion for judgment n.o.v., appears to be somewhat disingenuous since it is made by a law firm representing all defendants even though its success would leave one defendant, Mr. Capuano, personally exposed to punitive damages in a retrial. In any case, the argument is without merit for three reasons.
First, the argument was raised too late to allow its consideration on appeal. Defendants concede, as they must, that they did not raise this corporate defense until they filed their post-judgment motions. Furthermore, they took a contrary position in the charge conference. Their attorney said, "I think if they find fraud against Mr. Capuano and they decide whatever he did he did within the scope of his employment, that's what the law is, then the corporations are liable." Without objection before or after the charge, this case was submitted to the first jury on the theory that the corporations would be liable for all damages if Capuano had committed acts of fraud within the scope of his employment.
Thus, this aspect of the case is controlled by our decision in Viviano v. CBS, Inc., 251 N.J.Super. 113, 597 A.2d 543 (App.Div.1991), wherein we made the following observations:
In the present case, the jury awarded punitive damages only against CBS and not against the individual defendants. Defendants contend that plaintiff's proofs did not warrant assessing punitive damages against the corporation. They argue that exemplary damages may be assessed against a corporation only if the wrongful acts were committed by employees so high in authority as to be fairly considered executive in character or by agents authorized to act in the particular manner deemed wrongful or if the corporation ratified the wrongful acts.
We agree that the trial court did not charge the jury that awarding punitive damages required their finding that the employees responsible for the reprehensible conduct were executives or that the conduct was ratified by the corporation. However, the defendants did not request such a charge or object to the charge as given. We will therefore not reverse on the basis of that omission.
[Id. at 130, 597 A.2d 543 (citations omitted).]
Defendants argue that Viviano is distinguishable because it "holds only that *424 such silence waives the right to appeal omission of a charge, not the lack of evidence." We disagree. If, as is the case under Viviano, a corporate defendant cannot complain of the court's failure to include a charge on corporate, as distinct from individual, liability, it is because that issue was not in the case as tried. In Viviano, supra, we arrived at that view by application of the plain error rule. 251 N.J.Super. at 130, 597 A.2d 543. The same result obtains by application of the doctrine of judicial estoppel. See supra Section II. The doctrine bars defendants from now asserting a legal position inconsistent with that taken earlier. Cummings, supra, 295 N.J.Super. at 385-88, 685 A.2d 60 (explaining that the doctrine attaches when "the party was allowed by the court to maintain the position").
Second, we would note, as did the trial judge, that there was evidence showing involvement of upper management in the fraud, including the April 27, 1990, meeting and the June 18, 1990, letter sent by Capuano to his supervisor, an assistant vice-president with BANS.
Third, the corporations may be held liable for punitive damages because they ratified Capuano's conduct by instituting the declaratory judgment action and conducting a single defense with him to justify their retention of plaintiff's proprietary information for what was a negligible compensation in the context of this case. See, e.g., Cappiello v. Ragen Precision Indus., Inc., 192 N.J.Super. 523, 471 A.2d 432 (App.Div.1984):
Also, since Ragen [the corporation] here has participated in a single defense with its executives in an effort to retain plaintiff's commissions, we can well find a specific ratification of [their] actions.
[Id. at 531, 471 A.2d 432.]
C. Plaintiff's Argument that the Trial Judge Improperly Granted a New Trial on Punitive Damages
On defendants' motion after the first trial, the judge determined that the $25 million punitive damage award was excessive and granted a new trial subject to an offer of remittitur, which plaintiff rejected. The standards governing our review of the judge's decision to grant a new trial were restated in the following manner in Caldwell v. Haynes, 136 N.J. 422, 432, 643 A.2d 564 (1994):
In reviewing a trial court's ruling on a motion for a new trial, an appellate court shall not reverse a trial court "unless it clearly appears that there was a miscarriage of justice under the law." R. 2:10-1. Accordingly, "The standard for appellate review of a trial court's decision on a motion for a new trial is substantially the same as that controlling the trial court except that due deference should be made to its `feel of the case,' including credibility." Feldman v. Lederle Lab. [Laboratories], 97 N.J. 429, 463, 479 A.2d 374 (1984) (quoting Dolson v. Anastasia, 55 N.J. 2, 6, 258 A.2d 706 (1969)). At the same time, a trial court's determination is "not entitled to any special deference where it rests upon a determination as to worth, plausibility, consistency or other tangible considerations apparent from the face of the record with respect to which he is no more peculiarly situated to decide than the appellate court." Dolson, supra, 55 N.J. at 7, 258 A.2d 706.
The trial judge's granting of the motion for a new trial did not rest on the worth or plausibility of evidence, the credibility of witnesses, or other intangible factors not revealed by the record. Consequently, we "may review for excessiveness the jury's award[ ] based on an independent review of the record." Id. at 433, 643 A.2d 564.
Stated broadly, punitive damage awards should be vacated as excessive where the amount clearly supports the inference that the jury acted out of mistake, passion, prejudice, or partiality; where it is so disproportionate as to shock the conscience; or where it would result in a *425 manifest denial of justice. Leimgruber v. Claridge Assocs., 73 N.J. 450, 459, 375 A.2d 652 (1977). Our review of a punitive damage award must occur "with an appreciation that at the core of punitive damages lurks a volatile dilemma: the same findings necessary for the award of punitive damages can incite a jury to act irrationally." Herman v. Sunshine Chem. Specialties, Inc., 133 N.J. 329, 337, 627 A.2d 1081 (1993). Although a jury should consider all of the circumstances surrounding the event, including the nature of the wrongdoing, the extent of injury, the intent and wealth of the wrongdoer, as well as any mitigating evidence, Leimgruber, supra, 73 N.J. at 456, 375 A.2d 652, ultimately the award of punitive damages "must bear some reasonable relation to the injury inflicted and the cause of the injury." Id. at 457, 375 A.2d 652.
In Maiorino v. Schering-Plough Corp., 302 N.J.Super. 323, 357, 695 A.2d 353 (App.Div.), certif denied, 152 N.J. 189, 704 A.2d 19 (1997), the court vacated as shocking to the judicial conscience an $8 million punitive damage award where the compensatory damages were set by the jury at $435,000. And in Continental Trend Resources, Inc. v. OXY USA, Inc., 101 F.3d 634 (10th Cir.1996), cert. denied, 520 U.S. 1241, 117 S.Ct. 1846, 137 L.Ed.2d 1049 (1997), the court held as unconstitutional under the Due Process Clause of the Federal Constitution a punitive damage award of $30 million in a commercial litigation involving actual damages of about $1 million. Id. at 642.
On the other hand, in Almog v. Israel Travel Advisory Service, Inc., 298 N.J.Super. 145, 149, 161, 689 A.2d 158 (App.Div. 1997), appeal dismissed, 152 N.J. 361, 704 A.2d 1297 (1998), the court indicated in dictum that punitive damage awards of $4,500,000, where the compensatory damages were $1,324,000, and $1,000,000, where the compensatory damages were $40,000, represented acceptable ratios between compensatory and punitive damages.
The United States Supreme Court's case law also provides guidance. In Pacific Mutual Life Insurance Co. v. Haslip, 499 U.S. 1, 23-24, 111 S.Ct. 1032, 1046, 113 L.Ed.2d 1, 23 (1991), the Supreme Court indicated that a punitive damage award that was four times the amount of the compensatory damages might be "close to the line ... of constitutional impropriety."
In TXO Production Corp. v. Alliance Resources Corp., 509 U.S. 443, 460-62, 113 S.Ct. 2711, 2721-23, 125 L.Ed.2d 366, 381-82 (1993), the Supreme Court sustained as constitutional a punitive damage award of $10 million, although the compensatory damages were only $19,000. But, the Court emphasized that in sustaining this judgment it was taking into account the "magnitude of the potential harm that the defendant's conduct would have caused to its intended victim if the wrongful plan had succeeded, as well as the possible harm to other victims that might have resulted if similar future behavior were not deterred." Id. at 460, 113 S.Ct. at 2721-22, 125 L.Ed.2d at 381. The Court explained that in referring to potential harm as a basis for allowing a high ratio, it meant harm that was "likely to result" from the defendant's tortious act. Ibid. (internal quotations omitted). In TXO, the victim was able to prove that its likely damages, in a well-established business involving oil and gas drilling, were at least $1 million. Id. at 461-62, 113 S.Ct. at 2722, 125 L.Ed.2d at 381-82.
In BMW of North America, Inc. v. Gore, 517 U.S. 559, 116 S.Ct. 1589, 134 L. Ed.2d 809 (1996), the Court noted that it had permitted a 10:1 ratio in the TXO case:
Thus, in upholding the $10 million award in TXO, we relied on the difference between that figure and the harm to the victim that would have ensued if the tortious plan had succeeded. That difference suggested that the relevant ratio was not more than 10 to 1.
*426 [Id. at 581, 116 S.Ct. at 1602, 134 L.Ed.2d at 830.]
Although the BMW Court noted that it had consistently rejected the notion that the constitutional line is "marked by a simple mathematical formula," id. at 582, 116 S.Ct. at 1602, 134 L.Ed.2d at 830, it went on to make these pertinent remarks:
Indeed, low awards of compensatory damages may properly support a higher ratio than high compensatory awards, if, for example, a particularly egregious act has resulted in only a small amount of economic damages. A higher ratio may also be justified in cases in which the injury is hard to detect or the monetary value of non-economic harm might have been difficult to determine.
[Id. at 582, 116 S.Ct. at 1602, 134 L.Ed.2d at 831.]
We are satisfied that in this case we are not dealing with a particularly egregious act, only one sufficiently egregious to allow punitive damages. Moreover, the injury was not difficult to detect, and the reasonably likely economic harm, the value of the second phase, was not difficult to determine.
Although plaintiff claims that the jury should have been permitted to consider the loss of the third-phase damages, the $400 million dollars in alleged lost profits, those damages were not likely to result from defendants' conduct. They were, as the trial judge properly determined, too speculative for consideration by a jury. If they were too speculative to be considered under the heading of compensatory damages, in our view they cannot be the reference point for a punitive damage award.
In reaching the conclusion that the trial judge did not err in vacating the punitive damage award, we need not, and expressly do not, reach the constitutional issue. Although we have referred to the federal cases for guidance, our determination is based on New Jersey law and its rule that punitive damages with no reasonable relationship to the harm incurred may not be permitted to stand. See Maiorino, supra, 302 N.J.Super. at 357, 695 A.2d 353.
In sum, considering the nature of the case, a claim for purely economic injury; the informality of the parties' dealings; the amount of actual harm inflicted; and the implausibility of plaintiff's claim that it was likely to suffer some $400 million in lost profits, we are satisfied, despite Bell's great wealth, that the $25 million punitive damage award was the result of mistake, passion, prejudice, or partiality and was so disproportionate to the harm done as to shock the court's conscience. Consequently, we cannot say, as would be necessary for plaintiff to prevail on this point, that the trial judge's decision to grant a new trial clearly caused "a miscarriage of justice under the law." R. 2:10-1.
D. Plaintiff's Argument for a New Trial on Punitive Damages
This argument is directed at the second trial, which resulted in a $1 million punitive damage award against defendants. Although defendants have offered arguments indicating that this second trial was unfair to them in certain respects, they do not contend, as part of their cross-appeal, that this judgment should be reversed. On the other hand, plaintiff strenuously argues that it is entitled to a new trial on punitive damages. However, that argument is based on the assumption that a new trial would somehow be limited to the amount of damages. We disagree with that assumption. Consequently, although we are satisfied that plaintiff is entitled to a new trial on the subject of its entitlement to punitive damages, in light of the lack of a cross-appeal, we will permit plaintiff to opt for retention of the judgment.
The overarching problem that rendered the second trial unfair was confusion about what was to be tried. More specifically, the plaintiff, and the trial judge at times, treated the case as if the only issue was the amount of damages to be awarded. The defendants, on the other hand, tried *427 the case, with the indulgence of the judge, and over the objection of plaintiff, on the theory that plaintiff was required to prove fraud and that defendants' conduct was sufficiently egregious to warrant punitive damages. They were also permitted to argue that corporate liability for fraud had not been shown. That last argument was improper in the context of this trial in light of the position taken by defendants during the first phase of the first trial. See Cummings, supra, 295 N.J.Super. at 385-88, 685 A.2d 60.
The problem arose from a misunderstanding of the law regarding retrial of a punitive damage claim. The judge and plaintiff assumed that a retrial on the punitive damage claim could be limited to consideration of the amount of damages. Apparently, they viewed a punitive damage retrial as similar to a retrial of compensatory damages where no error has occurred regarding the liability issues. See, e.g., Caldwell v. Haynes, 136 N.J. 422, 643 A.2d 564 (1994); Taweel v. Starn's Shoprite Supermarket, 58 N.J. 227, 276 A.2d 861 (1971). But that view is unsound; they are not similar.
The governing principal is that the limitation of a new trial to the ascertainment of the amount of damages can only be ordered where that issue is "entirely distinct and separable from the issue of liability; otherwise, such procedure would work a denial of a fundamental right." Juliano v. Abeles, 114 N.J.L. 510, 512, 177 A. 666 (N.J.Sup.1935). More recently, in Ahn v. Kim, 145 N.J. 423, 678 A.2d 1073 (1996), the Court, after holding "that the issues of negligence and causation are so interrelated that both issues must be retried," id. at 434, 678 A.2d 1073, observed that "[w]hether issues are sufficiently separable to warrant a partial retrial ultimately depends on the circumstances of each case." Id. at 434-35, 678 A.2d 1073.
In Abbamont v. Piscataway Township Board of Education, 269 N.J.Super. 11, 634 A.2d 538 (App.Div.1993), aff'd 138 N.J. 405, 650 A.2d 958 (1994), an action arising under the Conscientious Employee Protection Act, N.J.S.A. 34:19-1 to -8, plaintiff sought compensatory and punitive damages. After the jury found liability and awarded compensatory damages, the trial judge dismissed the complaint. 269 N.J.Super. at 15, 634 A.2d 538. We reinstated the compensatory damage award and remanded for a trial "solely on punitive damages." Ibid. We observed:
On remand, we leave it to the court to determine what facts are necessary for the plaintiff to hold the defendant liable for punitive damages, following the standard for liability for punitive damages set forth in Lehmann [v. Toys R' Us, Inc., 132 N.J. 587,] 624-25, 626 A.2d 445 [(1993)].
[Id. at 31, 634 A.2d 538.]
Although plaintiff reads Abbamont as supporting the proposition that a new trial on punitive damages may be limited to an assessment of the amount of damages, the Abbamont jury never reached the issue of plaintiff's right to punitive damages. Id. at 20, 634 A.2d 538. Thus, it is obvious that the court was remanding for a full trial on punitive damages, including the question whether the defendant's conduct was sufficiently malicious or wanton to justify such an award. The court's citation of Lehmann confirms this point. Nonetheless, Abbamont supports the view that there are circumstances in which the right and amount of punitive damages may be retried without upsetting a jury's verdicts on liability for compensatory damages and the amount thereof.
The validity of this view finds further support in Ripa v. Owens-Corning Fiberglas Corp., 282 N.J.Super. 373, 660 A.2d 521 (App.Div.), certif. denied, 142 N.J. 518, 665 A.2d 1111 (1995). This was a wrongful death, products liability case, arising from exposure to asbestos. The jury awarded the plaintiff approximately $380,000 in compensatory damages and $5.5 million in punitive damages. Id. at 378, 660 A.2d *428 521. While sustaining the compensatory award but remanding for a new trial on the issues of plaintiff's right to punitive damages and the amount thereof, we said the following:
Where punitive damages are concerned, the nature of defendant's conduct and the probability that defendant's conduct caused the injuries are prime considerations. Since this matter is to be remanded for a retrial only on punitive damages, we recognize that, of necessity, there must be some recapitulation for the jury of the basis for both the compensatory and punitive damage awards.
[Id. at 394, 660 A.2d 521.]
In both Abbamont and Ripa the punitive damage issues could be tried separately before another jury precisely because the issue of plaintiff's right to punitive damages was not so interwoven with that of liability as to cause the kind of confusion and uncertainty that would give rise to an unfair trial. In Abbamont, supra, plaintiff was wrongly fired and received damages for back pay. 269 N.J.Super. at 15, 634 A.2d 538. Plaintiff's right to punitive damages depended on the entirely distinct issue of his ability to prove that upper management was involved. Id. at 31, 634 A.2d 538. In Ripa, supra, defendant's liability required only that plaintiff prove the minimal elements of a products liability case. To obtain punitive damages, plaintiff had the additional burden under N.J.S.A. 2A:58C-5a[4] of proving that defendant's acts or omissions were motivated by "actual malice or accompanied by a wanton and willful disregard of the safety of product users, consumers, or others who foreseeably might be harmed by the product." See 282 N.J.Super. at 403, 660 A.2d 521.
We see no difference in substance between the circumstances in Abbamont and Ripa and those present here. The right to punitive damages in this case turns on proof of elements that are distinct from the elements of fraud. Although much of the evidence that was presented in the fraud trial will no doubt be repeated in a retrial of punitive damages, it will be addressed to what is, in essence, a different cause of action, namely whether the defendant's conduct justified punitive damages under the principles of Nappe, supra.
In reaching our conclusion that a separate trial may be had on the issue of plaintiff's right to punitive damages after a judge has vacated a punitive damage award as excessive, we recognize that a number of federal courts have come to the opposite view in cases involving fraud. See, e.g., Mason v. Texaco, 948 F.2d 1546, 1561 (10th Cir.1991) cert. denied, 504 U.S. 910, 112 S.Ct. 1941, 118 L.Ed.2d 547 (1992); Aldrich v. Thomson McKinnon Secs., Inc., 756 F.2d 243, 249 (2d Cir.1985); Malandris v. Merrill, Lynch, Pierce, Fenner & Smith, 703 F.2d 1152 (10th Cir.1981) cert. denied, 464 U.S. 824, 104 S.Ct. 92, 78 L.Ed.2d 99 (1983); Slater v. KFC Corp., 621 F.2d 932 (8th Cir.1980); and Smyth Sales v. Petroleum Heat & Power Co., 141 F.2d 41 (3rd Cir.1944). But we find more persuasive the contrary and more recent opinion expressed in Atlas Food Systems and Services, Inc. v. Crane National Vendors, 99 F.3d 587 (4th Cir.1996):
A district court's decision to order a new trial falls within the district court's discretion, and the propriety of granting a new trial on fewer than all of the issues in a case hinges on whether the issues to be retried are sufficiently "distinct and separable from the others that a trial of [those issues] alone may be had without injustice." Gasoline Products Co. v. Champlin Refining Co., 283 U.S. 494, 500, 51 S.Ct. 513, 515, 75 L.Ed. 1188 (1931). Considerations of economy, fairness, and repose may provide justification for preserving a jury's liability determination that has been fairly and fully made and ordering only a new trial on damages "where there is no substantial indication that the liability and damage issues are inextricably interwoven, *429 or that the first jury verdict was the result of a compromise of the liability and damage question." Great Coastal Express, Inc. v. International Brotherhood of Teamsters, 511 F.2d 839, 846-47 (4th Cir.1975). We review a district court's decision to grant a partial new trial for abuse of discretion. See Swentek v. USAIR, Inc., 830 F.2d 552, 560 (4th Cir.1987); Great Coastal Express, 511 F.2d at 847.
In this case, we find no indication in the record to support National Vendors' suggestion that the district court's decision to set aside the first jury's punitive damage award necessitated a full retrial on all issues because the jury's "prejudice" may have infected its rulings on Atlas' substantive claims. A jury's reasonable findings of liability and compensatory damages are not rendered unreasonable simply on the basis that it awarded an excessive amount of punitive damages. Moreover, in this case, the district court concluded that there was sufficient evidence to support the jury's liability and compensatory damage findings, and National Vendors has not appealed any of those rulings.
We also conclude that the district court's decision to limit the second trial to punitive damage issues was not an abuse of discretion based on the interrelationship of punitive damage issues with other issues in the case. All of the evidence relating to National Vendors' willful or wanton conduct was before the second jury, enabling it to render a proper verdict on both the liability for and amount of punitive damages.
[Id. at 599-600 (alteration in original).]
Although we have indicated our belief that plaintiff is entitled to a new trial, we have not as yet explained why in detail. We turn to that subject now. We will begin by describing the events leading up to the confusion that undercut the fairness of the second trial.
In the first trial, the judge erred by having the jury decide in the first phase the issues of liability, compensatory damages, and plaintiff's right to punitive damages. That course was inconsistent with the Supreme Court's decision in Herman v. Sunshine Chemical Specialties, Inc., 133 N.J. 329, 627 A.2d 1081 (1993). In that case, the Court held that the following provision of N.J.S.A. 2A:58C-1 to -7, which deals with products liability actions, shall apply to "all claims for punitive damages, even those that arise outside the act." Herman, supra, 133 N.J. at 346, 627 A.2d 1081.
The trier of fact shall first determine whether compensatory damages are to be awarded. Evidence relevant only to punitive damages shall not be admissible in that proceeding. After such determination has been made, the trier of fact shall, in a separate proceeding, determine whether punitive damages are to be awarded.

[N.J.S.A. 2A:58C-5b (emphasis added).][5]
The Court also explained that the amount of damages would be decided, as well, in the second proceeding. Herman, supra, 133 N.J. at 342-343, 627 A.2d 1081.
There was no objection to the trial judge's procedural approach, and in the context of the first trial the error caused no harm because the same jury decided all issues and no evidence bearing only on punitive damages was admitted in the first phase. But it would appear that resolution by the first jury of plaintiff's right to punitive damages in the first phase may have planted the seed that grew to undercut the fairness of the second trial.
*430 In his written opinion of December 5, 1996, vacating the $25 million award, the judge concluded by stating, "In the event plaintiffs do not accept remittitur, a retrial as to damages is ordered." In the ensuing order, he wrote that "A TRIAL AS TO DAMAGES ONLY IS ORDERED.... [emphasis added]." On December 19, 1996, the judge wrote to counsel for the purpose of "clarify[ing] the remittitur Order." He added, "Please note that [the] provision in the Order relating to a retrial is limited to punitive damages." On December 20, 1996, plaintiff filed a pleading rejecting the remittitur and electing a new trial as to "punitive damages only."
On February 28, 1997, the judge had a hearing on defendants' "motion in limine concerning the scope of retrial." Defendants argued there had to be a retrial of the entire case if plaintiff rejected the remittitur. Plaintiff took the position that the issue of its entitlement to punitive damages was settled by the jury's verdict in the first phase of the first trial, which declared its entitlement to punitives. The judge agreed with plaintiff, stating "that the sole issue on retrial is the quantum of punitive damages." (Emphasis added.)
But shortly before the trial, at a hearing on April 28, 1997, the defendants' attorney claimed
I may argue to this jury you may find he [Capuano] didn't do anything wrong, return zero, you may find he did something wrong and return less than 375, or you may decide he did something terribly wrong and return more than 375, but you've got to base it on the facts in this courtroom yourselves.... Nobody can be bound by what that jury actually found.
Plaintiff's counsel replied
He cannot say to this jury Mr. Capuano didn't do anything wrong ... because there's been a finding that they did commit fraud.
The Court replied, saying
I believe they can, I believe he can take that position....
At trial, the confusion began with plaintiff objecting when defense counsel repeatedly argued in his opening statement that the jury could find that no fraud had been committed, but the judge overruled the objections, even though he also said the second jury "will not change what the first jury decided." At the conclusion of defendants' summation, plaintiff also objected to the argument made therein that the evidence showed that defendants had done nothing wrong. The objection was overruled. Furthermore, the confusion was aggravated by defendants' summation, which began and ended with the argument that the first verdict was unjust. Defense counsel said at the beginning of his summation, "I'm trying to do my best because I represent a man [Capuano] who I think the facts show has been dealt an injustice. I'm trying to deal with that injustice in the context of this case." At the end of his summation, he said of Capuano, "This guya wrong has been done to him and he has on his shoulder for the rest of his life this fraud verdict and don't pile on him, just don't pile on him, be fair."
In charging the jury, the confusion continued when the judge failed to explain that the plaintiff was not automatically entitled to punitive damages simply because fraud had occurred. That is, he did not charge that punitive damages can only be awarded if the defendants' conduct was malicious or in wanton and willful disregard of plaintiff's rights. Nappe, supra, 97 N.J. at 49, 477 A.2d 1224. Indeed, he did the opposite; he told the jury that it was bound by the first jury's determination that punitive damages were warranted. Nor for that matter did he charge that plaintiff had a burden of proof with respect to the issue submitted to the jury, namely the amount of damages based on consideration of the factors set forth in Herman, supra, the nature of the wrongdoing, the extent of harm, the defendants' intent, the defendants' financial condition, *431 and the effect the judgment would have on the defendants. 133 N.J. at 337-38, 345, 627 A.2d 1081.
Plaintiff did not object to the charge. And, if, as we believe, plaintiff had the burden of proving the Nappe elements, the charge can be seen as unfairly beneficial to plaintiff. Clearly, the judge did not charge the Nappe elements because he viewed the entitlement to punitive damages to have been settled by the first jury.
Although plaintiff did not object to the charge, the errors in the charge are not the focus of its argument. Rather, plaintiff's point is that it was denied a fair trial because the judge permitted defendants to argue, as they did, that they had not committed fraud and even to argue that the first verdict was unjust.
The defendants were doubtless frustrated by the failure of the judge to recognize the impropriety of a new trial limited to the amount of punitive damages. However, the recourse they chose, trying the case as if the judge had ruled in their favor, is indefensible, even though the judge did not prevent them from making their improper arguments.
The result was utter confusion. And even though the jury awarded plaintiff punitive damages, we have no confidence in the proposition that the amount of damages was not adversely affected by defendants' strategy, as described above. Therefore, plaintiff is entitled to a new trial, if it so chooses; but that trial will have to address plaintiff's right to punitive damages under the principle set forth in Nappe, supra.
In the second trial, plaintiff again argued that the jury should be allowed to consider evidence of "potential harm" to plaintiff in assessing punitive damages. As before, plaintiff's reference here is to the $400 million claim for lost profits. As noted above, we agree with the judge's determination that this claim for compensatory damages was too speculative for consideration by a jury. Although that vast sum of money might be described as reflecting the potential harm to the plaintiff, it is not a harm that occurred and it is not a harm that was likely to result from the fraud. Therefore, the judge was correct in refusing to allow the jury to determine punitive damages in relation to it. BMW of North America v. Gore, 517 U.S. 559, 116 S.Ct. 1589, 1601, 134 L.Ed.2d 809 (1996); Pulla v. Amoco Oil Co., 72 F.3d 648, 660 (8th Cir.1995).
The judgment is affirmed,[6] but we remand to permit plaintiff to exercise its right to a new trial by serving on defendants and filing in the Law Division an appropriate notice within 45 days of the filing of this opinion.
Affirmed and remanded.
NOTES
[1] PMV's allegations were contained in a counterclaim and third-party complaint. The action, as reflected in the caption, was instituted by Bell Atlantic Network Services, Inc. It sought a declaratory judgment that the only contract arising from this business venture was a $25,000 consulting agreement. The other parties mentioned in the caption are no longer relevant, with the exception of Bell Atlantic Corporation and Anthony W. Capuano, the BANS employee who negotiated with PMV. The case was tried as if PMV was the plaintiff and Bell, BANS, and Capuano were the defendants. Consequently, we will refer to PMV as "plaintiff" and to the others as the "defendants."
[2] Although we will continue to make some references to Capuano's testimony, in each case, the jury was entitled to reject it and accept the contrary evidence favorable to plaintiff.
[3] ["W]e will leverage the consultants' knowledge about Home Automation in technical and marketing related areas ... to provide [the] necessary experience for [Bell] to carry out these tasks in the future."
[4] We note that L.1995, c. 142, § 8, deleted subsection a.
[5] In 1995, the Legislature adopted the Punitive Damages Act, L. 1995, c. 142, §§ 1-11; N.J.S.A. 2A:15-5.9 to -15.17, which is applicable to all causes of action for punitive damages filed on or after October 27, 1995. Section 8 deleted N.J.S.A. 2C:58C-5b, quoted above, as well as subsections 5a and 5d. Under the Punitive Damages Act, bifurcation in the manner described by the deleted statute, as interpreted by the Court in Herman, is only required if a defendant so requests. N.J.S.A. 2A:15-5.13.
[6] An appellate court, having determined that a plaintiff is entitled to a new trial, would ordinarily reverse the judgment and remand. But in this case, we are confronted with the unusual circumstance that plaintiff's request for a new trial is premised on the incorrect legal assumption that a new trial could be ordered without disturbing the judgment on liability for punitive damages. Since we cannot predict the course plaintiff will choose following receipt of this opinion, and since, in light of the absence of a cross-appeal attacking the punitive damage award, plaintiff is entitled to affirmance of the judgment, if it so desires, we have taken the approach of affirming the judgment and remanding so that the election may be made. If plaintiff elects a new trial, the Law Division is directed to enter an order vacating the judgment.

We note that the final order, read literally, inadvertently awards judgment to Bell. If plaintiff does not pursue its right to a new trial, a corrected judgment may be submitted to the trial court.