**LIBERTY LIFE ASSURANCE COM-PANY OF BOSTON and Keyport Life Insurance Company,**

v.

**STONE STREET CAPITAL, INC., and James J. White.**

No. B–99–2015.

United States District Court, D. Maryland.

April 20, 2000.

H. Mark Stichel, Gohn, Hankey & Stichel, Baltimore, MD, for plaintiffs.

Daniel A. Ball, Patricia A. LaBorde, Lewis, Goldberg & Ball McLean, VA, for defendant Stone Street Capital, Inc.

Brian E. Barkely, Barkely & Kennedy, Rockville, MD, for defendant James J. White.

WALTER E. BLACK, Jr., Senior District Judge.

Presently pending before the Court is Plaintiffs Liberty Life Assurance Company of Boston's and Keyport Life Insurance Company's Motion for Summary Judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. In the underlying Complaint, plaintiffs seek declaratory relief pursuant to 28 U.S.C. 2201(a) to resolve the rights and duties of the parties under a personal injury settlement agreement and an annuity purchased to fund the settlement agreement. More specifically, plaintiffs seek a declaration regarding whether the right to receive the annuity payments is assignable, and also a declaration clarifying whether they are bound by a consent judgment entered into by the defendants that directs where the annuity payments shall be sent.

I.

On July 11, 1995, defendant James J. White entered into a Settlement Agreement ("Settlement Agreement") that resolved a suit brought by White for personal injuries that he sustained in an automobile accident. The Settlement Agreement obligated Liberty Mutual Insurance Company ("Liberty Mutual") to pay White an immediate cash payment of $162,500, plus periodic payments of $1,000 per month for life, guaranteed for 20 years, commencing July 29, 1995 (the "Periodic Payments"). According to the Settlement Agreement, all of the sums constitute damages for personal injuries or sickness within the meaning of Section 104(a)(2) of the Internal Revenue Code of 1986, as amended ("Internal Revenue Code").

The Settlement Agreement also sets forth the rights of the parties regarding assignments. Paragraph 3 of the Settlement Agreement provides that:

Plaintiff acknowledges that the Periodic Payments cannot be accelerated, deferred, increased or decreased by the Plaintiff or any Payee; nor shall the Plaintiff or any Payee have the power to sell, mortgage, encumber, or anticipate the Periodic Payments, or any part thereof, by assignment or otherwise.

The Settlement Agreement further provides that Liberty Mutual may make a "qualified assignment," within the meaning of Section 130(c) of the Internal Revenue Code, of Liberty Mutual's liability to make the Periodic Payments to Keyport Life Insurance Company ("Keyport"). Liberty Mutual made such an assignment to Keyport on July 14, 1995.

Paragraph 6 of the Settlement Agreement provides that the assignee, Keyport, may purchase an annuity from Liberty Life Assurance Company of Boston ("Liberty Life") to fund the obligation to make the Periodic Payments. Paragraph 6 further provides that the owner of the annui-

ty, Keyport, may direct Liberty Life to mail the annuity payments directly to White. The Settlement Agreement then charges White with the responsibility of maintaining his current mailing address with Liberty Life. As contemplated by the Settlement Agreement, Keyport purchased an annuity, Policy Number NP3–001968, ("the Annuity") from Liberty Life on August 1, 1995, to fund its obligation to pay White.

On March 21, 1997, White allegedly breached the Settlement Agreement by assigning his right to receive the monthly payments to Stone Street Capital, Inc. ("Stone Street") and directing Liberty Mutual to send the payments to P.O. Box 27835, Newark, New Jersey 07101–7835, which is a lockbox controlled by Stone Street. Stone Street is a financial firm that structures and provides present value payments for lottery winners and beneficiaries of structured settlements. Plaintiffs allegedly sent the payments to Stone Street's lockbox through December 1997. In early 1998, however, White redirected the payments to his home address at 209 East Sparks Street, Warrensburg, Missouri.

After Stone Street failed to receive the Annuity payments at its lockbox, it filed a complaint against White for breach of contract and related causes of action in the Circuit Court for Montgomery County, Maryland. Stone Street and White eventually stipulated to the entry of a consent judgment (the "Consent Judgment"), which was approved by the Montgomery County Circuit Court. The Consent Judgment ordered Liberty Mutual to send all of the Annuity payments to White at Stone Street's lockbox address, and ordered White to refrain from redirecting the payments. After the Consent Judgment was entered, Liberty Life and Keyport moved to intervene and vacate. The court, however, denied the motion on the ground that it was untimely.

Between filing its motion to intervene in the Consent Judgment and the denial of the motion to intervene, plaintiff Liberty Life also filed a Complaint for Interpleader in this Court. Stone Street and White, who were defendants in the interpleader action along with Keyport, moved for summary judgment, which was granted based on the Court's finding that interpleader jurisdiction did not exist. During the pendency of the interpleader action, the Court ordered Liberty Life to tender all Annuity payments to the registry of the Court (the "Registry Funds"). When the Court granted summary judgment, it ordered the Clerk of the Court to remit the Registry Funds to Liberty Life.

The plaintiffs filed the present Complaint on July 8, 1999, seeking declaratory relief under 28 U.S.C. § 2201(a). More specifically, in Count One of the Complaint, Liberty Life seeks a declaration that it is not bound by the Consent Judgment entered by the Circuit Court for Montgomery County and that Stone Street and/or White will have no legally cognizable claim against it if it follows Keyport's direction as to where it should send the monies to be refunded to it by the Registry of the Court in the Interpleader Action and future payments to be made under the Annuity. In Count Two, Keyport seeks declarations that (1) White's purported assignment of the Periodic Payments is invalid and wholly void; that Keyport, as the owner of the Annuity, has the sole power to direct to whom payments should be made; and that neither Keyport not Liberty Life is under any obligation to Stone Street with respect to the Settlement Agreement, the Annuity or any Annuity Payments, and (2) that the Funds in the Registry of the Court that are to be refunded to Liberty Life are the sole property of White and that Liberty Life and Keyport shall properly discharge their obligations to White by Keyport's directing that Liberty Life send the funds to be refunded by the Registry of Court and all future Periodic Payments directly to White at his residence address. In Count Three, Liberty Life and Keyport seek a declara-

tion that the Consent Judgment has no effect upon the rights or duties of Keyport, Liberty Life or any person or entity other than Stone Street or White.

On September 3, 1999, defendants moved to dismiss the Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure on the grounds that (1) plaintiffs are barred by the doctrine of res judicata; (2) the Court lacks jurisdiction under the Declaratory Judgment Act because there is no case or controversy; and (3) plaintiffs are improperly using the Declaratory Judgment Act as a substitute for an appeal. On January 14, 2000, the Court denied defendants' motion in an unpublished opinion.

Presently before the Court is plaintiffs' motion for summary judgment with respect to all counts of their Complaint. None of the parties appear to dispute any issues of material fact. Therefore, the Court finds that the case is ripe for disposition on summary judgment. The disputed issues of law are (1) whether White's assignment to Stone Street is invalid and wholly void, and (2) what effect, if any, does the Consent Judgment have on the rights of Liberty Life and Keyport.

## II.

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is warranted if there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law. *Lujan v. National Wildlife Fed'n*, 497 U.S. 871, 884, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990). Summary judgment is not appropriate unless, viewing all possible inferences in a light most favorable to the nonmoving party, no reasonable jury could return a verdict in its favor. *Helm v. Western Maryland Ry. Co.*, 838 F.2d 729, 734 (4th Cir.1988).

When a motion for summary judgment has been made and supported, Rule 56(e) provides that the party opposing summary judgment must set forth specific facts showing that there is a genuine issue for trial and may not rest upon mere allegations or denials of the adverse party's pleading. The mere existence of a *scintilla* of evidence is insufficient. Rather, there must be evidence from which the jury could reasonably find for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

## III.

■ The Court first addresses the validity of White's assignment to Stone Street of his right to receive the Periodic Payments under the Settlement Agreement. As this case arises under the Court's diversity jurisdiction pursuant to 28 U.S.C. § 1332, the Court must resolve this issue in accordance with the substantive law that a Maryland court would apply. *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). Under Maryland choice of law rules, "it is generally accepted that the parties to a contract may agree as to the law which will govern their transaction, even as to issues going to the validity of the contract." *National Glass, Inc. v. J.C. Penney Properties, Inc.*, 336 Md. 606, 610, 650 A.2d 246 (1994) (quotations omitted). Here, the Settlement Agreement contains a choice of law provision which provides that it will be construed and interpreted in accordance with Missouri law. Accordingly, the Court will apply Missouri law.

■ Under Missouri law, "[t]he cardinal rule in the interpretation of a contract is to ascertain the intention of the parties and to give effect to that intention." *J.E. Hathman, Inc. v. Sigma Alpha Epsilon Club*, 491 S.W.2d 261, 264 (Mo.1973) (en banc). "The courts seek to ascertain the intent of the parties by giving to the language used its natural, ordinary, and common sense meaning, but they also look to the entire contract; and the court should consider the object, nature and purpose of the agreement." *Wilshire Const. Co. v.*

*Union Elec. Co.*, 463 S.W.2d 903, 906 (Mo. 1971).

■ Generally, Missouri courts will give effect to contract provisions that specifically prohibit the assignment of one's right to receive money due under a contract. *See Raytown Consol. Sch. Dist. No. 2 v. Am. Arbitration Assoc.*, 907 S.W.2d 189, 191 (Mo.Ct.App.1995). The Court, however, is unaware of, and the parties have not submitted to the Court, any Missouri law specifically addressing the assignment of the right to payments under a structured settlement. Nonetheless, other jurisdictions have considered this issue. In doing so, many of these courts have applied the assignment principles embodied in the Restatement (Second) of Contracts. *See e.g. Grieve v. Gen. Am. Life Ins. Co.*, 58 F.Supp.2d 319, 322–23 (D.Vt.1999); *Wonsey v. Life Ins. Co. of N. Am.*, 32 F.Supp.2d 939, 943 (E.D.Mich.1998). The parties in this case have also structured their arguments within the framework of the Restatement (Second) of Contracts. Further, the Eighth Circuit has applied the assignment provisions of the Restatement (Second) of Contracts in a Missouri contract case even though the Missouri Supreme Court has never expressly adopted them. *See Cedar Point Apartments, Ltd. v. Cedar Point Investment Corp.*, 693 F.2d 748, 753–54 (8th Cir.1982). The Court, therefore, will likewise analyze the parties' arguments within this framework.

Section 317(2) of the Restatement (Second) of Contracts provides that:

A contractual right can be assigned unless

(a) the substitution of a right of the assignee for the right of the assignor would materially change the duty of the obligor, or materially increase the burden or risk imposed on him

by his contract, or materially impair his chance of obtaining return performance, or materially reduce its value to him, or

(b) the assignment is forbidden by statute or is otherwise inoperative on grounds of public policy, or

(c) assignment is validly precluded by contract.

Plaintiffs first argue that White's assignment to Stone Street is invalid under § 317(2)(a) because it materially increases the burden or risk imposed on Keyport. More specifically, plaintiffs assert that if White is permitted to assign the Periodic Payments to Stone Street, the plaintiffs will no longer be able to predict the tax implications, accounting implications, administrative costs, and risk of exposure to competing claims to future settlement payments. According to plaintiffs, predictability is a critical element of transactions involving long-term liability, and they attempted to protect themselves from uncertainty by placing an anti-assignment clause in the Settlement Agreement. In particular, the plaintiffs fear the loss of predictability regarding the favorable tax treatment that they currently receive.

Under § 130 of the Internal Revenue Code, insurance companies, like Keyport, who assume the liability to make periodic payments on account of a personal injury are eligible for favorable tax treatment if certain conditions are satisfied. While the parties disagree about whether an assignment of the right to receive periodic payments affects this tax treatment, they do agree about the basic operation of the tax provisions in a structured settlement. According to the authorities submitted to the Court by the parties, a typical personal injury structured settlement based on the facts of this case would operate as follows:[1] First, the tortfeasor's insurer, Lib-

---

**1.** Defendants submitted an opinion letter from PricewaterhouseCoopers, L.L.P. dated February 25, 1999, and plaintiffs submitted the testimony of Treasury Department Legislative Counsel Joseph M. Mikrut before the Subcommittee on Oversight of the House Committee on Ways and Means, March 18, 1999. Among other things, both of these documents discuss the basic tax implications of structured settlements.

erty Mutual, would assign to another company, Keyport, its liability to make the periodic payments to the plaintiff, White. In exchange for assuming its liability, Liberty Mutual would pay Keyport a lump sum, which Liberty Mutual could immediately deduct from its gross income. Keyport would then use the lump sum to purchase an annuity to fund the periodic payments to White. If the transaction met the requirements of § 130, Keyport would not have to report the lump sum as income until it received the annuity payments, at which time it would be entitled to an offsetting deduction for periodic payments made to White. And if White met the requirements of § 104(a)(2), he could exclude the periodic payments from his gross income, including any portion of the periodic payment that represents interest income generated by the annuity.

Taken together, these tax rules effectively provide that nobody is ever taxed on the periodic payments. In the absence of the favorable tax treatment, however, Keyport may have to immediately report as income all of the funds it received from Liberty Mutual, and it would not be entitled to deductions until it subsequently made the periodic payments.

For Keyport to receive this favorable tax treatment, the assignment of Liberty Mutual's liability to Keyport must be a "qualified assignment" within the meaning of § 130(c). An assignment is only a "qualified assignment" if it meets certain requirements. Relevant here are the requirements under sections 130(c)(2)(B) and (D). Under § 130(c)(2)(B), the "periodic payments cannot be accelerated, deferred, increased, or decreased by the recipient of such payments." In this case, plaintiffs fear that the Internal Revenue Service ("IRS") may view White's assignment as an acceleration of his periodic payments, which would prevent Keyport from complying with § 130(c)(2)(B).

Plaintiffs also fear that the assignment would prevent them from complying with § 130(c)(2)(D), which requires that the periodic payments be excludable from the gross income of the recipient under § 104(a). Under § 104(a)(2), payments are only excludable from gross income if the recipient receives the payments "on account of personal physical injuries or sickness." I.R.C. § 104(2). Plaintiffs fear that after the assignment, the IRS may no longer consider the periodic payments to be personal injury compensation, presumably because the IRS might consider the payments to White to be made "on account of" an agreement with Stone Street rather than "on account of" personal injuries. If the payments to White are not on account of personal injuries, the payments would not be excludable from White's gross income under § 104(a). This, in turn, would prevent Keyport from complying with § 130(c)(2)(D).

Because the IRS has not provided guidance on how it would treat an assignment of periodic payments, plaintiffs argue that White's assignment would result in a loss of predictability regarding the favorable tax treatment that it currently receives. As such, plaintiffs argue that the assignment is invalid under § 317(2)(a) of the Restatement (Second) of Contracts because it materially increases their burden and risks.

■ Defendants, on the other hand, argue that the assignment does not materially affect the plaintiffs' risk or burden under § 317(2)(a). In fact, defendants assert that the IRS, in Private Letter Ruling 119273–97, already concluded that an assignment of structured settlement payments will have no adverse tax consequences under § 130. The Court, however, is not so convinced. The private letter ruling only addresses whether an assignment of payments under a structured settlement would affect the tax status of an individual under § 104(a)(2). *See* Priv. Ltr.Rul. 119273–97 at 5. Notably, the private letter ruling specifically declined to rule on the request to resolve how an assignment would affect the tax status of a party, such as Keyport, under § 130.

Further, the private letter ruling states that the ruling is only directed at the taxpayer sending it, and that the ruling may not be used or cited as precedent. *Id.* at 6; *see also* 26 U.S.C. § 6110(k)(3) (1998).

The other authorities upon which defendants rely are equally ineffective in allaying Keyport's concerns. First, defendants cite a Third Circuit case, *Western United Life Assurance Co. v. Hayden,* in which a Chapter 13 debtor had previously assigned her right to receive periodic payments under a settlement agreement. 64 F.3d 833, 835–36 (3rd Cir.1995). The debtor then argued that the assignment was ineffective and that the periodic payments belonged to her bankruptcy estate. *Id.* at 836. The debtor reasoned that she never had the power to assign the periodic payments because the resulting negative tax consequences created an implied restriction against assignment in the settlement agreement. *Id.* at 841. The Third Circuit, however, refused to infer that the settlement agreement was intended to limit the debtor's right to assign the payments, finding the debtor's tax argument to be a "novel proposition." *Id.* at 842.

The Court finds that the *Hayden* decision is of limited precedential value in this case. Most importantly, the IRS was not a party in *Hayden* and, therefore, is not bound by the decision. Additionally, the Court finds that the arguments made by the debtor in *Hayden* are distinguishable from those made by Keyport in this case.

Defendants also cite an opinion letter prepared by PricewaterhouseCoopers, LLP, at the request of the National Association of Settlement Purchasers dated February 25, 1999. In its letter, PricewaterhouseCoopers opines that an assignment of the right to receive structured settlement payments by an annuitant, like White, would not place an insurance company, like Keyport, at risk of incurring adverse tax consequences. The Court, however, finds that the PricewaterhouseCoopers opinion letter in support of the

trade association of settlement purchasers in its ongoing dispute with the insurance industry is just that—an opinion.

Thus, if the IRS ever disputes Keyport's tax status, each of the defendants' sources may provide Keyport with arguments regarding why it should continue to receive preferential tax treatment despite White's assignment. Nonetheless, defendants' sources are not dispositive of the issue and provide no assurance whatsoever that the issue would, in fact, be decided in plaintiffs' favor. Consequently, the Court finds that White's assignment increases the risks and burdens on plaintiffs because it deprives them of their ability to predict the costs and implications of Keyport's tax treatment under § 130.

The Court further finds that the increased risks and burdens imposed on Keyport by the White's assignment are material. *See Grieve,* 58 F.Supp.2d at 323 (holding that an assignment would materially increase the risk of adverse tax consequences to an insurance company in a similar case under § 317(2)). While the Court recognizes that the plaintiffs could never predict the tax implications of a structured settlement with absolute certainty, plaintiffs can certainly attempt to structure the terms of a contract to reduce the level of uncertainty to the fullest extent possible. That is clearly what plaintiffs intended to do in this case. Based on the nature and the terms of the contract, the Court is satisfied that the plaintiffs drafted the contract with the purpose of ensuring that they received preferential tax treatment under § 130. The Settlement Agreement even specifically references § 104(a)(2) and § 130(c). Further, the inclusion of an anti-assignment clause manifests plaintiffs' concerns regarding the potential tax implications of an assignment by White. Therefore, the Court finds that White's commitment that he would not assign the Periodic Payments was a material part of the Settlement Agreement because it increased plaintiffs' ability to predict their tax liability. Be-

cause White's assignment would materially increase the burden or risk imposed on plaintiffs, the Court finds that White's assignment to Stone Street is void under § 317(2)(a) of the Restatement (Second) of Contracts.

■ White's assignment is also void under § 317(2)(c) of the Restatement (Second) of Contracts. This section prohibits assignments where the right to assign is validly precluded by contract. Section 322(2)(b), however, provides that "[a] contract term prohibiting assignment of rights under the contract, unless a different intention is manifested, ... gives the obligor a right to damages for breach of the terms forbidding assignment but does not render the assignment ineffective."

Here, Paragraph 3 of the Settlement Agreement clearly forbids White from assigning the Periodic Payments. Rather than seeking damages for White's breach, however, the plaintiffs seek a declaration that White's assignment to Stone Street is void. To award plaintiffs such relief, § 322(2)(b) requires a finding that such an intention is manifested.

Courts that have interpreted § 322 have generally distinguished between a party's "right" to assign and a party's "power" to assign. *See e.g. Bel–Ray Co. v. Chemrite Ltd.*, 181 F.3d 435, 442 (3rd Cir.1999); *Cedar Point Apartments, Ltd.*, 693 F.2d at 754. As expressed by § 322(2)(b), the law presumes that "contractual provisions limiting or prohibiting assignments operate only to limit a parties' right to assign the contract, but not their power to do so, unless the parties' manifest an intent to the contrary with specificity." *Bel–Ray Co.* 181 F.3d at 442 (citations omitted). The Third Circuit has held that to limit the parties' power to assign, "the assignment

provision must generally state that nonconforming assignments (i) shall be 'void' or 'invalid,' or (ii) that the assignee shall acquire no rights or the nonassigning party shall not recognize any such assignment." *Id.* "In the absence of such language, the provision limiting or prohibiting assignment will be interpreted merely as a covenant not to assign." *Id.* Breach of the covenant may give rise to damages, but it will not render the assignment invalid or unenforceable. *Id.*

In this case, the defendants argue that the anti-assignment clause in the Settlement Agreement only creates a covenant not to assign because it does not use the specific language set forth by the Third Circuit in *Bel–Ray*. Consequently, defendants assert that plaintiffs can only recover actual damages. In response, plaintiffs argue that the express denial of White's "power" to assign his rights is equivalent to language expressly stating that the assignment is "void" or "invalid."

The Court finds that the Settlement Agreement manifests an intent to deny White the power to assign his rights to the Periodic Payments. First, it recognizes that requiring the use of specific language, such as "void" or "invalid" helps to resolve any conceivable ambiguity about whether the parties intended to limit the "power" to assign rather than the "right" to assign. Nonetheless, the Court can think of no clearer way to communicate an intent to deny a party the power to assign than to expressly say so. That is precisely what Liberty Mutual did here. The Settlement Agreement clearly states: "nor shall [White] have the power to sell, mortgage, encumber or anticipate the Periodic Payments, or any part thereof by assignment or otherwise." [2]

---

**2.** The Court rejects defendants' argument that the language in the Settlement Agreement is ambiguous with respect to whether the parties intended to prohibit White from making an assignment. Defendants point to the use of the terms "heirs, assigns and successors" in Paragraph 1 ("This release, on the part of

the Plaintiff, shall be a fully binding and complete settlement among the Plaintiff, the Defendants and the Insurer, and their heirs, assigns and successors.") and the reference to White "or any payee" in Paragraph 3. Defendants argue that this language gives White the "power" to assign, despite clear and unam-

Second, the intent to deny White the power to assign is manifested by Liberty Mutual's concern regarding the tax implications of such an assignment. As the Court previously discussed, the inclusion of an anti-assignment clause and the specific references to § 104(a)(2) and § 130(c) of the Internal Revenue Code, when taken together, demonstrate that the parties were attempting to ensure to the fullest extent possible that they would receive favorable tax treatment. The best way to avoid the potential adverse tax consequences resulting from an assignment would be to deny White the power to assign.

Third, at least one other court interpreting an identical anti-assignment clause under the Restatement (Second) of Contracts in a structured settlement case has held that the clause was valid and enforceable. *See Grieve*, 58 F.Supp.2d at 322–23; *see also Johnson v. First Colony Life Ins.*, 26 F.Supp.2d 1227 (C.D.Cal.1998) (upholding an almost identical anti-assignment clause in a structured settlement case)

■ Defendants also attempt to avoid the anti-assignment clause in the Settlement Agreement by asserting that it is invalid under the Article 9 ("Secured Transactions, Sales of Accounts, and Chattel Paper") of the Uniform Commercial Code ("UCC"). More specifically, defendants argue that § 9–318(4) of the UCC, as codified in Missouri at Mo.Rev.Stat. § 400.9–318(4), denies the effectiveness of any provision that seeks to prohibit the assignment of payment rights. According to defendants, § 400.9–318(4) applies because White and Stone Street created a security interest in general intangibles when White granted Stone Street a securi-

ty interest in his payment right so that Stone Street could enforce the contracts. In response, plaintiffs argue that Article 9 of the UCC does not apply in this case. Alternatively, plaintiffs argue that even if the Article 9 applies, the transaction would be excluded under § 400.9–104(g), which expressly removes from Article 9's scope any "transfer of an interest or claim in or under any policy of insurance."

After reviewing the relevant statutes and case law, the Court finds that § 400.9–318(4) clearly does not enable defendants to avoid the anti-assignment provision in the Settlement Agreement. *See Grieve*, 58 F.Supp.2d at 323–24 (holding that Vermont UCC did not void an anti-assignment clause in a similar structured settlement); *Wonsey*, 32 F.Supp.2d at 941–42 (holding same under Michigan UCC); *Bobbitt v. SAFECO Assigned Benefits Serv. Co.*, No CV 990588205S, 1999 WL 703066, at *4 (Conn.Super. Aug.25, 1999) (holding same under Connecticut UCC); *Henderson v. Roadway Express*, 308 Ill.App.3d 546, 242 Ill.Dec. 153, 720 N.E.2d 1108, 1113 (1999) (holding same under Illinois UCC).

In sum, the Court finds that the anti-assignment clause is a valid and enforceable term of the Settlement Agreement, and that plaintiffs intended the clause to deny White the power to assign his rights under the Settlement Agreement. Accordingly, the Court further finds that White's assignment to Stone Street is invalid and wholly void.

## IV.

■ Plaintiffs also seek declarations clarifying whether they are bound by a consent judgement entered into by the defendants and approved by the Circuit

biguous language to the contrary, even though he entered into a covenant not to assign. As plaintiffs correctly point out, however, the terms "heirs, assigns and successors" apply to the class of persons releasing Liberty Mutual and its insured from liability, and do not imply that the right to the payments was assignable. Further Paragraph 2 of the Settlement Agreement defines "Payee"

as the "individual names below," and White's name is the only name listed. The words "or any Payee" in Paragraph 3 is a necessary provision to include any beneficiary who may be entitled to payments after White's death. Thus, when read as a whole, the Settlement Agreement clearly manifests the intent of the parties to deprive White of the power to assign.

Court for Montgomery County, Maryland that directs Liberty Mutual to send the annuity payments to White at Stone Street's lockbox address. Both the parties and the Court already addressed the effect of the Consent Judgment on the plaintiffs in connection with defendants' motion to dismiss. In their motion, defendants argued, in part, that plaintiffs were bound by the Consent Judgment notwithstanding the fact that neither defendant was named as a party in the state court action. In its unpublished opinion, the Court ruled that the Consent Judgment did not bind Liberty Life or Keyport. In doing so, the Court found that Maryland courts would apply the general principle of Anglo–American jurisprudence cited by the Supreme Court in *Martin v. Wilks,* 490 U.S. 755, 761, 109 S.Ct. 2180, 104 L.Ed.2d 835 (1989), that "one is not bound by a judgment *in personam* in a litigation in which he is not designated as a party or to which he has not been made a party by service of process." Because White and Stone Street were the only parties involved in the Consent Judgment, the Court held that the state court action did not determine the rights of Liberty Life or Keyport.

In their memoranda submitted in regard to plaintiffs' Motion for Summary Judgment, neither party raised any new arguments with respect to this issue. Therefore, the Court finds that the Consent Judgment has no effect upon the rights or duties of Keyport or Liberty Life. Because the Court has resolved both disputed legal issues in plaintiffs favor, the Court further finds that plaintiffs are entitled to judgment as a matter of law. Accordingly, the Court will grant plaintiffs, motion for summary judgment.

A formal Order will be entered in conformity with this Opinion.