750 A.2d 211 (2000)
330 N.J. Super. 608
Carol OWEN, Plaintiff-Respondent,
v.
CNA INSURANCE/CONTINENTAL CASUALTY COMPANY, Defendant-Appellant.
Superior Court of New Jersey, Appellate Division.
Argued January 20, 2000.
Decided May 11, 2000.
Lee A. Rosengard, Philadelphia, PA, for defendant-appellant (Stradley, Ronon, Stevens & Young, attorneys; Mr. Rosengard and Francis X. Manning, of counsel and on the brief).
Sherry L. Foley, for plaintiff-respondent (Foley & Foley, attorneys; Ms. Foley, on the brief).
*212 Before Judges STERN, KESTIN and WEFING.
The opinion of the court was delivered by STERN, P.J.A.D.
Defendant insurance carrier appeals from the grant of summary judgment to plaintiff in this declaratory judgment action seeking to require defendant to honor her assignment of the proceeds of a structured settlement. The settlement agreement provided:
The claimant shall have the right to change the Contingent Payee at any time during the term of this Agreement by filing written notice with the Company, such change to be effective when accepted by the Company in writing as of the date such notice was signed, except as to any payments made by the Company before such change was accepted.
To the extent provided by law, the aforesaid deferred lump sum payments shall not be subject to assignment, transfer, commutation or encumbrance, except as provided herein.
This appeal requires us to consider the extent to which the law may prohibit the assignment. There is a dispute as to whether plaintiff assigned merely the $20,636.48 payment due in December 2001 or also the $30,321.76 payment due in December 2006. However, that issue does not affect the legal question on which summary judgment was granted because the parties agree the same principle would apply if only the payment due in 2001 was assigned.[1]
On this appeal defendant argues that Article 9 of the Uniform Commercial Code (U.C.C.) does not prohibit the enforcement of the non-assignment clause in the structured settlement, as claimed by plaintiff; that the trial court failed to consider the effect of Article 2 of the U.C.C.; and that the trial court erred in its analysis of common law and public policy considerations.

I.
On September 15, 1983, plaintiff Carol Owen (then Carol Hydo) of Spotswood, New Jersey, signed a release in favor of parties she had sued in a personal injury case arising out of a slip and fall at a Bamberger's store in East Brunswick, New Jersey. Incident thereto, plaintiff entered into a settlement agreement with defendant, the tortfeasors' insurer. Under the terms of the settlement agreement, plaintiff received an initial lump sum of $10,000, attorney's fees of $15,000 and five deferred lump sum payments totaling $81,067.24. The payments were to be made in December 1986, 1991, 1996, 2001 and 2006. In the structured settlement agreement, quoted above, plaintiff agreed that she would not assign or otherwise encumber the deferred lump sum payments.
On December 22, 1997, plaintiff entered into a "Purchase and Sale Agreement" with Metropolitan Mortgage and Securities Company under which she agreed to "sell, convey, transfer and assign" to Metropolitan all her "rights and benefits" under the settlement agreement with defendant for $8,520.20. "Benefits" included "[a]ll of the rights, titles, estates, interests, powers, privileges, and benefits (of every description whatsoever) of the plaintiff ... in, to or under ... the Settlement Agreement... (including, without limitation, the entire Remaining Balance and excluding therefrom only the Unpurchased Benefits, *213 if any)...." At the time of the sale plaintiff was entitled to receive two more payments under the structured settlement, one for $20,636.48 in December 2001, and one for $30,321.76 in December 2006.
As a result of the agreement with Metropolitan, plaintiff signed an irrevocable special power of attorney, "exhibit G" to the agreement, directing the attorney-infact designated by Metropolitan "[t]o accept, sign, endorse ... in my name and on my behalf, all checks ... payable to my order, ... and received pursuant to [the settlement agreement with defendant]." (emphasis added.) Plaintiff also agreed to defend, indemnify and hold Metropolitan harmless from any claim that her benefits were not assignable, and to "order and conduct [her] affairs as to prevent the assertion of any claim that the Benefits were not assignable."
Incident to the agreement, in January 1998 plaintiff sent defendant a notarized letter directing it to send "all future payments and other mail" to an address in Syracuse, New York. Defendant responded by sending her a copy of the settlement agreement and noting that the deferred lump sum payments were "not subject to assignment, transfer, commutation or encumbrance." After plaintiff's attorney wrote several letters to defendant seeking confirmation that defendant had changed the address, defendant requested confirmation that plaintiff resided at the Syracuse address. Plaintiff's counsel responded by enclosing a letter of complaint to the Department of Insurance and indicating that she "will file the complaint" in the absence of "immediate[ ] written acknowledgment" that defendant changed plaintiff's mailing address. Defendant advised plaintiff's counsel that plaintiff could not assign her payments and that defendant always sends the payments "to the claimant's actual address."
This action was thereafter commenced. In her complaint plaintiff sought to compel defendant to acknowledge the address change. She also sought a declaration that the non-assignment clause in the settlement agreement was void and unenforceable, thereby permitting her assignment to Metropolitan.
In response to plaintiff's motion for summary judgment, defendant presented an affidavit of Susan Goulet, defendant's Vice President. In the affidavit, Ms. Goulet explained why defendant requires that all structured settlements contain a provision prohibiting an assignment. Defendant explained that it is concerned about the "risk of being required to make double payment" because so many tort plaintiffs "are of diminished physical or mental capacity" due to their injuries, and their beneficiaries and heirs attack the assignments based on the diminished capacity. Defendant said it is also concerned about the potential of litigation resulting from competing claims because tort plaintiffs have made multiple assignments of the same interest and have executed documents assigning the entire interest in a structured settlement when they intended to assign only a portion thereof.[2] Defendant also insists that because the assignment of a structured settlement has tax consequences for the assignor and imposes a tax reporting burden on the carrier, the non-assignment provision assures that defendant "is able to fulfill its [legal] obligations." Moreover, the Goulet affidavit states that defendant incurs administrative expenses in processing an assignment and has been subjected to liens for the amount of "assigned periodic payments on account of a tort plaintiff's failure to make court ordered child support or alimony payments, or due to a tort plaintiff's having past due tax obligations or outstanding judgments."

II.
Defendant suggests that the law of Illinois may apply to this structured settlement *214 because its principal office is located there. But New Jersey follows the governmental interest analysis in deciding choice of law questions, Marinelli v. K-Mart Corp., 318 N.J.Super. 554, 563, 724 A.2d 806 (App.Div.1999), aff'd, 162 N.J. 516, 745 A.2d 508 (2000); and there is no choice of law issue to be considered in the absence of a conflict between the law of the respective states, ibid.; Gantes v. Kason Corp., 145 N.J. 478, 484, 679 A.2d 106 (1996).[3] Because we agree with defendant's major contentions under New Jersey law, there would appear to be no conflict.[4] However, even if there were a conflict, we would apply New Jersey law, given the entry of the structured settlement here upon disposition of New Jersey litigation involving injury to a New Jersey resident. See Marinelli, supra, 318 N.J.Super. at 562, 724 A.2d 806; Gantes, supra, 145 N.J. at 484, 679 A.2d 106.

III.
Plaintiff contends that Article 9 of the U.C.C. addressing secured transactions prohibits the non-assignment provision of her agreement with defendant and renders it void. A provision of Article 9, as adopted in N.J.S.A. 12A:9-318(4), provides:
A term in any contract between an account debtor and an assignor is ineffective if it prohibits assignment of an account or prohibits creation of a security interest in chattel paper or a security interest in a general intangible for money due or to become due or requires the account debtor's consent to the assignment or security interest.
The trial judge agreed with plaintiff's contention.
N.J.S.A. 12A:9-104(k) provides that Article 9 does not apply "[t]o a transfer in whole or in part of any claim arising out of tort." The trial court, in a written opinion, found that "[t]he structured settlement agreement was structured and must be viewed as a contract in all respects, inasmuch as it deals with the disposition of proceeds that result from a tort claim, not from the tort claim itself." The judge cited Berkowitz v. Haigood, 256 N.J.Super. 342, 346, 606 A.2d 1157 (Law Div.1992). The trial judge further noted that under Chelsea-Wheeler Coal Co. v. Marvin, 134 N.J. Eq. 432, 437, 35 A.2d 874 (E. & A.1944), a prohibition of assignment "may be disregarded where it is not the main purpose of the contract." The judge therefore concluded "that as a consenting adult, Plaintiff has every right to choose for herself when, and how she wishes to manage her own financial affairs," and that her request "to be relieved of Continental's non-assignment clause is entirely proper under current law."
Defendant contends that "[a] plain reading of section 9-104(k)'s exclusion shows that it applies not only to tort claims, but also the proceeds of such claims, and that if the drafters of Article 9 had wanted section 9-104(k) not to apply to the settlement proceeds of tort claims, they knew how to accomplish that [result]. The proof is in subsections (g) and (l) of section 9-104," which embody express exceptions. Defendant quotes Professor Amanda K. Esquibel, An Article 9 Primer Regarding Uninsured Collateral Destroyed By A Tortfeasor, 46 U. Kan. L.Rev. 211, 215 (1998), for the proposition that because "subsection (k) lacks any exception for proceeds, there can be no doubt that the [U.C.C.] drafters intended no exception for *215 proceeds of tort claims." In Professor Esquibel's words, "section 9-104(k)'s exclusion applies not only to tort claims, but also to the proceeds of such a claim." Id. at 214 (quoted in Insurance Co. of North America v. Della Indus., Inc., 998 F.Supp. 159, 164 (D.Conn.1998)).
This reading of Article 9 was recently adopted by a federal district court in a case involving an alleged breach of an indemnification and security agreement under a performance bond, resulting from the defendant's sale and assignment of a tort claim. In Della Indus., supra, 998 F.Supp. at 163-165, the court held that the claim was not subject to the parties' security agreement and was therefore assignable. The Court noted that tort claims are excluded from Article 9 because, as the U.C.C. Comment notes, "they do not customarily serve as commercial collateral." Ibid. The court quoted from Professor Esquibel's article, supra, and Barclays Bus. Credit, Inc. v. Four Winds Plaza Partnership, 938 F.Supp. 304 (D.Vi.1996), which considered at length the arguments regarding whether the payment of tort-claim proceeds under a settlement agreement were contractual in nature and subject to Article 9, or were tort-claim proceeds excluded from the scope of Article 9. Judge Stanley Brotman, sitting in the Virgin Islands by designation, concluded that "the better rule" was that the U.C.C. exempted tort settlement proceeds, as well as the claims, from the application of Article 9. Della Indus., supra, 998 F.Supp. at 164 (quoting Barclays, supra, 938 F.Supp. at 308-10). See also In re Ore Cargo, Inc., 544 F.2d 80 (2d Cir.1976); Liberty Life Assurance Co. of Boston v. Stone Street Capital, Inc., 93 F.Supp.2d 630, 637-38 (D.Md.2000) (section 9-318(4) "clearly does not enable defendants to avoid the anti-assignment provision in the Settlement Agreement"); Grieve v. General American Life Ins. Co., 58 F.Supp.2d 319, 322-24 (D.Vt.1999) (neither Vermont U.C.C. nor public policy prevented enforcement of anti-assignment clause of structured settlement); Interdevco v. Hollywood Federal Sav. and Loan Ass'n, 523 So.2d 773 (Fla.Dist.Ct.App.1988); Bluxome Street Assoc. v. Fireman's Fund Ins. Co., 206 Cal.App.3d 1149, 254 Cal.Rptr. 198, 202 (1988) (finding that Article 9 does not create security interest in the settlement proceeds of a tort claim).[5]
We agree that Article 9's express exclusion of tort claims includes the proceeds of a tort claim,[6] and therefore conclude that Article 9 does not prohibit the non-assignment provision of plaintiff's contract with defendant. Accordingly, we need not consider the impact of Article 2 or N.J.S.A. 12A:2-210, which defendant asserts to be material in light of N.J.S.A. 12A:9-318.

IV.
Since we have concluded that Article 9 does not prohibit the non-assignment provision of a structured settlement, *216 we must consider whether the non-assignability provision of this settlement agreement is otherwise enforceable under New Jersey law, which generally permits the assignment of settlement proceeds. See Berkowitz v. Haigood, supra, 256 N.J.Super. at 346, 606 A.2d 1157. Indeed, by statute, "all judgments and decrees recovered in any of the courts" in New Jersey are assignable, N.J.S.A. 2A:25-1, unless the parties have expressly agreed otherwise. A prohibition on assignment "may be disregarded where it is not the main purpose of the contract, but is a mere incident to such main purpose." Chelsea-Wheeler, supra, 134 N.J. Eq. at 437, 35 A.2d 874. See Metropolitan Life Ins. Co. v. Woolf, 138 N.J. Eq. 450, 457-58, 47 A.2d 340 (E. & A.1946).
Chelsea-Wheeler, supra, 134 N.J. Eq. at 435, 35 A.2d 874, involved an effort by the assignee to collect the proceeds of an insurance policy that contained a non-assignment provision for the benefit of the assignor and other family members. After determining that non-assignability was one of the main purposes of the agreement because it had specifically provided for periodic payments over time, the Court of Errors and Appeals concluded that non-assignment was a material term of the agreement, and enforced the contract according to its terms. Id. at 437-39, 35 A.2d 874. Defendant contends that because "the transaction between Ms. Owen and Metropolitan strikes at the very purpose of the settlement agreement, it should not be enforced." According to defendant:
One main purpose of the settlement agreement is to guarantee payment to Ms. Owen or her heirs over time .... rather than in a lump sum, in light of Ms. Owen's circumstances. To ensure a continued income stream at five year intervals, and to protect it from dissipation or attachment by creditors prior to the receipt of each periodic payment, the settlement agreement contained non-assignment language designed to achieve that very result.
There can be nothing more central to a structured settlement than the structure itself. In its absence, it is just a plain settlement, and upon receipt of the entire proceeds at the time the agreement is entered into, the full settlement sum is subject to attack from all quarters. That is exactly what Ms. Owen and Continental did not want, and it is why, under Chelsea-Wheeler, the provision prohibiting "assignment, transfer, commutation or encumbrance" must be said to be a main purpose of the contract.
Another reason that the assignment restriction forms a main purpose of the settlement agreement involves the Internal Revenue Code. As noted above, one benefit of structured settlement arrangements is that [it] ... is [not] taxable to the original tort plaintiffhere, Ms. Owen. 26 U.S.C. § 104(a)(2). However, if a tort plaintiff receives a lump sum and invests the money, the earnings on the lump sum are taxable. 26 U.S.C. § 1001. By receiving deferred payments, therefore, the plaintiff enjoys a tax-free gain that, had she invested the money herself, would have been taxable income.
If rights to periodic payments were freely assignable, transferable, or able to be accelerated, the plaintiff could lose the tax-free benefit. See Revenue Ruling 79-220, 1979-2 C.B. 74 (a claimant who has actual or constructive receipt of the economic benefit of any lump-sum amount is not permitted to exclude the income from the investment of such payment under section 104(a)(2)). Similarly, if the periodic payments are assigned to a third-party (like Metropolitan), Continental could be found not to be making subsequent settlement payments on account of personal injuries, and the tort plaintiff could lose the exemption provided by Section 104(a)(2). This would put the plaintiff at risk of losing the benefit *217 of future tax-free payments and at risk of being taxed on the payment received from the assignee.
In addition, in the event the periodic payments were freely assignable, the party making the payments (here, Continental) could face tax-reporting issues it bargained to avoid. Because the payments are tax-free to the plaintiff, the payor does not have to report any portion of the payment as income to the plaintiff. Absent restriction on assignment, the payor could have the obligation to report the earnings contained in each future payment. 26 U.S.C. § 6041. Failure to report these earnings could expose the payor to tax-reporting liabilities and penalties. 26 U.S.C. § 6721 (failure to file an information return); § 6722 (failure to file a payee statement); § 6723 (failure to comply with other information reporting requirements). If the payment were deemed to have been received under a commercial annuity contract, it would be subject to withholding under 26 U.S.C. § 3405(a), and could also be subject to backup withholding under 26 U.S.C. § 3406. Protecting both Ms. Owen and Continental from such adverse tax consequences would also have been a main purpose of the non-assignment provision of the settlement agreement.[7]
Defendant points to a recent unpublished federal District Court opinion to support its concerns about potential tax consequences and the resulting burden and risk. We may not rely on unpublished opinions. R. 1:36-3. But see Johnson v. First Colony Life Ins. Co., 26 F.Supp.2d 1227, 1229 (C.D.Cal.1998), where the Federal District Court entered summary judgment for the defendant insurers, holding that the structured settlement contract "very clearly prohibits plaintiffs from assigning their right to receive the proceeds of the contract." The court noted that plaintiffs "failed to overcome the presumption that the nonassignability clause is for the benefit of the [insurer]" and that the tax consequences of an assignment posed a legitimate risk to the carrier. Id. at 1229-30, 1230 n. 4.[8]See also Liberty Life, supra, 93 F.Supp.2d at 636 ("inclusion of an anti-assignment clause manifests [the carriers'] concerns regarding the potential tax implications of an assignment"; court found anti-assignment provision "was a material part of the Settlement Agreement because it increased [the carriers'] ability to predict their tax liability" and "assignment would materially increase the burden or risk imposed on [the carriers]").
Chelsea-Wheeler, as an opinion of the court of last resort in this State, is binding upon us, Bell Atlantic Network Serv., Inc. v. P.M. Video Corp., 322 N.J.Super. 74, 99, 730 A.2d 406 (App.Div.1999), and we are satisfied that the trial judge improperly granted summary judgment to plaintiff in the absence of further development of both the materiality of the anti-assignment provision and the legitimacy or reasonableness of the risks perceived to flow to defendant if the assignment were enforceable. See Restatement (Second) of Contracts § 317(2)(a) (1981):
A contractual right can be assigned unless
(a) the substitution of a right of the assignee for the right of the assignor would materially change the duty of the obligor, or materially increase the burden or risk imposed on him by his contract, or materially impair his chance of *218 obtaining return performance, or materially reduce its value to him,....[9]
See also Restatement (Second) of Contracts § 322(2) (1981) ("[a] contract term prohibiting assignment of rights under the contract, unless a different intention is manifested, (a) does not forbid assignment of a right to damages for breach of the whole contract or a right arising out of the assignor's due performance of his entire obligation; (b) gives the obligor a right to damages for breach of the terms forbidding assignment but does not render the assignment ineffective; (c) is for the benefit of the obligor, and does not prevent the assignee from acquiring rights against the assignor or the obligor from discharging his duty as if there were no such prohibition"); Garden State Buildings L.P. v. First Fidelity Bank, N.A., 305 N.J.Super. 510, 522, 702 A.2d 1315 (App.Div.1997), certif. denied, 153 N.J. 50, 707 A.2d 153 (1998) (adopting the principle that "such clause must contain express provisions that any assignment shall be void or invalid if not made in a certain specified way"); Bel-Ray Co., Inc. v. Chemrite (Pty) Ltd., 181 F.3d 435, 442 (3d Cir.1999) (stating that the Garden State Buildings court "[i]n adopting § 322, New Jersey joins numerous other jurisdictions that follow the general rule that contractual provisions limiting or prohibiting assignments operate only to limit a parties' right to assign the contract, but not their power to do so, unless the parties' manifest an intent to the contrary with specificity").
In future cases, the impact of a non-assignability provision can be spread on the record at the time the settlement is entered, and a non-assignability clause should be enforced as written unless the record suggests otherwise. We know no policy which would preclude such enforcement as a matter of law if it is a material condition of the settlement, but in this case the record is silent with respect to the counseled negotiations and execution of the settlement at a time the parties acknowledge the law governing assignability remained unclear. Accordingly, we remand for further proceedings relating to the materiality and enforceability of the provision governing the non-assignability of the structured settlement.
Both parties point to pending federal and state legislation that may preempt or affect our conclusion. Until such legislation is adopted, however, we cannot deem it to be dispositive.

V.
The judgment is reversed, and the matter is remanded for further proceedings consistent with this opinion.
KESTIN, J.A.D., dissenting.
I dissent for the reasons stated by Judge Wolfson in his well-considered written opinion disposing of the matter in the trial court. I cannot improve on his rationale for granting plaintiff's motion for summary judgment, nor upon the reservations he articulated; and, therefore, set out his opinion essentially in full:
In this case, I am being asked to decide an issue that implicates the oft-debated arena of legislative versus judicial policy making. On its face, the issue is a relatively simple one: whether the "non-assignment of payments" provision contained in a "structured settlement" agreement may be excised at the request of the Plaintiff, so that she may assign her structured payments to a third party, on terms which, on their face, bespeak of unfairness and overreaching.
The notion that consenting adults should have the freedom to contract with each other must be examined against the argument that there are *219 some situations, particularly in the absence of equal bargaining power, where the need to protect the public may compel judicial or legislative intervention. Consequently, I must determine whether Plaintiff's proposed assignment of her anticipated payment (in exchange for current dollars), is so objectively unconscionable[1] that the Court should lend no aid to its consummation, even though the non-assignment clause may, itself, be inconsistent with and contrary to the public policy of this State.

FACTUAL BACKGROUND
In 1983, as a result of a slip-and-fall accident, Plaintiff Carol Owen signed a settlement agreement (the "agreement") with the defendant's insurer, Continental Casualty Corporation ("Continental") in which the following provisions were contained:
The Claimant shall have the right to change the Contingent Payee at any time during the term of this Agreement by filing written notice with the Company, such change to be effective when accepted by the Company in writing as of the date such notice was signed, except as to any payments made by the Company before such change was accepted.
To the extent provided by law, the aforesaid deferred lump sum payments shall not be subject to assignment, transfer, commutation, or encumbrance, except as provided herein (emphasis supplied).
As part of her agreement, Plaintiff received an initial lump sum of $10,000, and was to have received an additional $71,067.24, payable in five-year installments beginning on December 21, 1986, with the final payment scheduled to be made on December 21, 2006. In December 1997, Plaintiff decided to "sell" her right to receive future payments in exchange for current dollars, and in this regard, attempted to convey this future interest to Metropolitan Mortgage and Securities Co., Inc. ("Metropolitan"). In furtherance of the sale, Plaintiff wrote to Continental and directed it to change her address.[2] When Continental would neither confirm nor honor the change of address request, Plaintiff complained, without success, to the Department of Insurance.[3]
Plaintiff now seeks declaratory relief to compel Continental to acknowledge the address change, declare the non-assignment clause void and unenforceable, *220 and permit her to complete her financial transaction with Metropolitan.

ANALYSIS
Any examination of these financial transactions must begin with a review of N.J.S.A. 12A:9-318(4), which provides that:
A term in any contract between an account debtor and an assignor is ineffective if it prohibits assignment of an account or prohibits creation of [ ... ] a security interest in a general intangible for money due or to become due or requires the account debtor's consent to [the] assignment or security interest.
This statutory language, if applicable,[4] would presumably render the non-assignment clause within the Agreement void. In fact, the Official Comment to N.J.S.A. 12A:9-318(4), specifically acknowledges that the clause was intended to mark a departure from the traditional construction of anti-assignment provisions, in order to reflect the ever-changing economic landscape. See N.J.S.A. 12A:9-318(4), Official Comment (4).
Referring to Section 9-104(k), Continental correctly points out that Article 9 does not apply to "a transfer in whole or in part of any claim arising out of tort" (emphasis added), and argues that since the structured settlement proceeds in Owen's case did arise out of an underlying tort, the prohibitory language of N.J.S.A. 12A:9-318(4) is not a bar to enforcing the non-assignment clause. I am constrained to disagree. The structured settlement agreement was structured and must be viewed as a contract in all respects, inasmuch as it deals with the disposition of proceeds that result from a tort claim, not from the tort claim itself. Compare, Berkowitz v. Haigood, 256 N.J.Super. 342, 346, 606 A.2d 1157 (Law Div.1992), (N.J.S.A. 2A:25-1 requires that proceeds from a settlement of a claim for personal injuries must also be assignable).
Defendant also relies on Chelsea-Wheeler Coal Co. v. Marvin, 134 N.J. Eq. 432, 437-38, 35 A.2d 874 (E. & A.1944) which in part states that "even though a contract may prohibit assignment, such prohibition may be disregarded where it is not the main purpose of the contract," and urges that since the primary purpose of the Agreement was to ensure a steady cash flow to the Plaintiff, the non-assignment clause may be sanctioned in order to maintain the safety net afforded by those payments.[5] Despite the laudable goal of protecting Plaintiff from herselfthat is, from making poor financial decisions, it is beyond the province of the judiciary, however tempting it may be, to act in such a paternalistic manner.
Finally, Defendant urges that since these assignments are often made when the assignor is under some form of mental, physical or financial distress, many persons will be especially vulnerable to *221 the superior bargaining power of financial institutions such as Metropolitan. While the Court acknowledges the legitimacy of these policy considerations, the Court is equally mindful that as a consenting adult, Plaintiff has every right to choose for herself when, and how she wishes to manage her own financial affairs. This is especially so given the fact that Plaintiff has not sought to be relieved from her contractual obligations with Metropolitan. Absent any legislative response, neither the courts nor Continental should be heard to challenge the path selected by Owen.[6]

CONCLUSION
Despite my personal misgivings, Owen's request to be relieved of Continental's non-assignment clause is entirely proper under current law. I am, therefore, constrained to grant her a declaratory judgment to this effect, but not without inviting the Legislature to investigate the practices of this industry.
I add a few thoughts to Judge Wolfson's thoughtful explication. First, by way of updating his reference to another trial court decision in a similar matter which was pending on appeal at the time of Judge Wolfson's decision herein, we decided JUA Funding Corp. v. CNA Insurance without addressing the merits because the issues had become moot. 322 N.J.Super. 282, 730 A.2d 907 (App.Div.1999).
Secondly, I agree unreservedly with Judge Wolfson that there is a pressing need for legislative attention to the subject matter. It would be most unfortunate if the power of Judge Wolfson's suggestion were to be lost because its only publication is in a footnote in a derivative dissent. There seems to be an urgent need to provide standards for and regulation of transactions like the one here between plaintiff and Metropolitan in order to guard against apparent, possibly pervasive, overreaching.
Finally, I think it is important, by way of amplifying the policy perspectives involved, to set out at length the official Uniform Commercial Code (UCC) comment on the modern standard set out in N.J.S.A. 12A:9-318(4), to which Judge Wolfson referred. The statutory provision itself currently declares:
A term in any contract between an account debtor and an assignor is ineffective if it prohibits assignment of an account or prohibits creation of a security interest in chattel paper or a security interest in a general intangible for money due or to become due or requires the account debtor's consent to the assignment or security interest.
The official comment notes:
4. Subsection (4) breaks sharply with the older contract doctrines by denying effectiveness to contractual terms prohibiting assignment of sums due and to become due under contracts of sale, construction contracts and the like. Under the rule as stated, an assignment would be effective even if made to an assignee who took with full knowledge that the account debtor had sought to prohibit or restrict assignment of the claims.

*222 It is only for the past hundred years that our law has recognized the possibility of assigning choses in action. The history of this development, at law and equity, is in broad outline well known. Lingering traces of the absolute common law prohibition have survived almost to our own day.
There can be no doubt that a term prohibiting assignment of proceeds was effective against an assignee with notice through the nineteenth century and well into the twentieth. Section 151 of the Restatement of Contracts (1932) so states the law without qualification, but the changing character of the law is shown in the proposed Section 154 of the Restatement, Second, Contracts.

The original rule of law has been progressively undermined by a process of erosion which began much earlier than the cited section of the Restatement of Contracts would suggest. The cases are legion in which courts have construed the heart out of prohibitory or restrictive terms and held the assignment good. The cases are not lacking where courts have flatly held assignments valid without bothering to construe away the prohibition. See 4 Corbin on Contracts (1951) §§ 872, 873. Such cases as Allhusen v. Caristo Const. Corp., 303 N.Y. 446, 103 N.E.2d 891 (1952), would be rejected by this subsection.
This gradual and largely unacknowledged shift in legal doctrine has taken place in response to economic need; as accounts and other rights under contracts have become the collateral which secures an ever increasing number of financing transactions, it has been necessary to reshape the law so that these intangibles, like negotiable instruments and negotiable documents of title, can be freely assigned.
Subsection (4) thus states a rule of law which is widely recognized in the cases and which corresponds to current business practices. It can be regarded as a revolutionary departure only by those who still cherish the hope that we may yet return to the views entertained some two hundred years ago by the Court of King's Bench.
[Uniform Commercial Code § 9-318 cmt. 4 (1999).]
Additional official comments note that N.J.S.A. 12A:9-318(4) was "broadened [in 1972] to apply to general intangibles for money due as well as to accounts[,]" ibid., and was further expanded in 1981 and 1994.
To the extent pre-UCC New Jersey law contained any vestiges of the historic approaches criticized in the foregoing comment, it is clear from the New Jersey Study Comment regarding N.J.S.A. 12A:9-318(4) that our version of the statute was designed to accomplish the same end envisaged in the official UCC comment, nullification of the general prohibition against assignment:
4. Section 9318(4) states that a term in any contract between an account debtor and an assignor which prohibits assignment is ineffective. As to assignments governed by Article 9, this section will reverse the New Jersey rule announced in Metropolitan Life Ins. Co. v. Poliakoff, 123 N.J. Eq. 524, 198 A. 852(Ch.1938) that although a chose in action is inherently assignable, it becomes non-assignable if the contract out of which it arises forbids assignment. The underlying policy of finding assignability where possible has, however, been evident. See, e.g., Shannon v. City of Hoboken, 37 N.J. Eq. 123 (Ch.), aff'd o.b., 37 N.J. Eq. 318 (E. & A.1883). Section 9318(4) makes this policy a rule of law as to contracts within Article 9 by virtue of an assignment for security.
[N.J.S.A. 12A:9-318 New Jersey Study Comment 4 (1961).]
One way or another, either by reason of the enactment of this provision of the UCC, or via the earlier statutory abrogation of the general rule prohibiting assignment of rights, N.J.S.A. 2A:25-1, or because of case law disavowals, see, e.g., *223 Metropolitan Life Ins. Co. v. Woolf, 138 N.J. Eq. 450, 457-58, 47 A.2d 340 (E. & A.1946); Chelsea-Wheeler Coal Co. v. Marvin, 134 N.J. Eq. 432, 437, 35 A.2d 874 (E. & A.1944); Berkowitz v. Haigood, 256 N.J.Super. 342, 346, 606 A.2d 1157 (Law Div.1992), a holding that the assignment in this case was ineffective has no current legitimate provenance in law.
I cannot see how, in deciding this case, we can fail to give faithful effect to the fundamental policy generally underlying the UCC: promoting free commerce in property, including choses in action, by removing antiquated barriers that no longer make commercial sense if they ever did. Moreover, on a more practical and day-to-day basis, I can divine no good reason, in the absence of a specific statutory or regulatory prohibition, for limiting any person's access to the present monetary value of a contract right which will mature in the future. It is not for usor for an insurance carrierto say whether, when or how one who has fallen on hard times, or who wishes to invest in a new home, in a business opportunity or even only in the stock market, or who simply desires the financial flexibility access to the funds would bestow, may or may not achieve his or her monetary objectives. The courts have no such authority; certainly an insurance carrier cannot arrogate to itself any such role by offering patronizing or paternalistic justifications for the practice. In the face of well-accepted, modern, neutral principles of law, defendant has no warrant to limit plaintiff's choice in this connection, and no sufficiently concrete interest of its own upon which to enforce the limitation it seeks to impose.
I hasten to add further that while I regard the conditional prohibition of assignment in this case to be clearly unenforceable both as a matter of stated law and because it is against public policy, I would not necessarily preclude an action for damages for special losses incurred because of a breach of the contractual undertaking. That question is not before us in this case, however.
NOTES
[1] Plaintiff argues that the assignee's rights to the 2006 payment are contingent and would accrue only if it does not obtain the 2001 payment. Defendant insists that because the assignment was of "all ... rights and Benefits," there is a factual dispute concerning the scope of the assignment, and the factual dispute surrounding the 2006 payment emphasizes the problems inherent in permitting assignments at all. In any event, the parties appear to agree that any question concerning the scope of the assignment in this regard will be resolved by our resolution of the issue now before us.
[2] Defendant contends that the dispute in this case with regard to the scope of assignment confirms its concerns regarding the ability to assign a structured settlement.
[3] Defendant points to 215 Ill. Comp. Stat. Ann. 5/155.34 (erroneously cited as "215 ILCA 5/155.31"), as permitting assignment of structured settlements with court approval. Defendant also contends that the anti-assignment provision does not have to be a "main purpose of the contract" in Illinois, as plaintiff contends it does in New Jersey. Defendant argues that there can be no assignment in this case under the law of either state.
[4] Plaintiff does not address the choice of law issue except to note that defendant ultimately stated "no conflict exists" and that the trial court properly applied New Jersey law.
[5] We recognize that there is respectable authority for the proposition that section 9-104(k) does not exclude tort settlement proceeds from the scope of Article 9, In re Falkenberg, 136 B.R. 481, 485-86 (Bankr.N.D.Ohio 1992); In re Phoenix Marine Corp., 20 B.R. 424 (Bankr.E.D.Va.1982).
[6] Last year the American Law Institute and National Conference of Commissioners on Uniform State Laws adopted a revised U.C.C. While the U.C.C. was designed to promote "freedom of contract ... between the immediate parties to the security transaction," U.C.C. § 9-101(1998), Official Comment, and the revision considers most proceeds of a settlement to be subject to the provisions of Article 9, the revision also expressly provides that Article 9 "does not apply to ... an assignment of a claim arising in tort, other than a commercial tort claim ...." and security interests in tort claims that constitute proceeds of other collateral. Revised U.C.C. § 9-109(d)(12)(1999) and Official Comment 15 thereto. See also Revised U.C.C. § 9-102(a)(13)(1999), defining "commercial tort claim." While the revision would support our holding in this case if deemed a clarification of existing law, the New Jersey Legislature has not yet had time to review or adopt the revision. We, therefore, attribute no significance to the revision or to the Legislature's inaction.
[7] We do not necessarily agree with defendant's analysis of the law or agree with some of its concerns, particularly with regard to its obligation to protect plaintiff from the adverse consequences of her own conduct. However, defendant has a right to contract in an effort to avoid legitimate risks.
[8] The parties refer us to a plethora of unpublished opinions upon which we may not rely. R. 1:36-3.
[9] Liberty Life, supra, 93 F.Supp.2d at 637, found the assignment to be void under § 317(2)(c), as prohibiting an assignment "validly precluded by contract," as well as void under 317(2)(a). Given Chelsea-Wheeler, we believe the non-assignment provision must be material.
[1] In accordance with the documentation provided the Court, assigning her next scheduled structured settlement payment is tantamount to Plaintiff borrowing her own money at an interest rate of approximately 30%. More startling, perhaps, is the fact that under her agreement with Metropolitan, Owen is obligated to pay any and all legal fees incurred in these proceedings. Undoubtedly, these fees will be deducted from the proceeds otherwise payable by Metropolitan, resulting in an effective interest rate even in excess of 30%. Unlike the classic "contract of adhesion," where a signatory to a contract asks to be relieved from unconscionable provisions, in this case, Plaintiff does not wish to avoid her contract with Metropolitan. Ironically, Continental, a non-party to that agreement, seeks to compel Plaintiff to abide by a conflicting contractual provision designed solely to protect her against this type of over-reaching.
[2] Plaintiff was apparently advised that she could circumvent the non-assignment clause by giving Metropolitan a "power of Attorney," (which authorized Metropolitan to endorse her structured settlement proceeds), and by thereafter directing Continental to change her mailing address in the hopes that her structured settlement check would simply be forwarded to Metropolitan without anyone ever discovering the subterfuge.
[3] In declining to honor Owen's requested address change, Continental alluded to the language of its own agreement with Owen, and indicated that since the structured payments were non-assignable, Continental would not mail those payments to an address that did not belong to the original payee. It would thus appear that Continental was aware that the "change of address/power of attorney" ploy was a popular method of circumventing the non-assignment clause.
[4] Plaintiff's case is nearly identical to an unreported Hudson County case, JUA Funding Corp. v. CNA Insurance/Continental Casualty Co. (Docket No. L-10824-97) recently decided by Judge Costello. There, an individual (DeMaria) had entered into a structured settlement agreement with Continental in which she was to have received a lump sum payment of $3,500, and 36 monthly payments of $463. A non-assignment clause, virtually identical to the one included in the Owen settlement agreement, was also contained in the DeMaria settlement agreement. Notwithstanding her agreement, she assigned her future payments to ... JUA. Holding N.J.S.A. 12A:9-318(4) to be controlling, Judge Costello invalidated the non-assignment clause as unenforceable. Her decision is currently on appeal.
[5] Defendant also suggests that its various administrative concerns, such as potential liability for erroneous tax reporting, or an increased likelihood of accidental double-payments are worthy, bargained for, protections that Continental intended to achieve through the non-assignment clause. These administrative risks are entirely speculative, and cannot tip the balance of equities in favor of Continental.
[6] Defendant points to several States that have either enacted or have introduced legislation which restricts, or, at least regulates, one's ability to assign future structured settlement payments: [Illinois (Ill.Comp.Stat.5/155.31) and Kentucky (S.B. 312, 1998 Reg. Sess.) (assignment of structured settlement payments invalid without court approval) (enacted); Connecticut (H.B. 5548, 1998 Reg. Sess.) (awaiting signature by the Governor)]. Suffice it to say that the policy considerations supporting these statutory schemes do not presently reflect the public policy of New Jersey, since our Legislature has yet to consider the mischief that an unregulated industry might visit upon our more vulnerable citizens. If the current scenario between Owen and Metropolitan is generally reflective of industry standards and procedures, then legislative oversight, though not judicial intervention, may well be warranted. Under these circumstances it would seem prudent for the Legislature to assess whether protective regulations, akin to those which have been enacted and are being considered in our sister jurisdictions, are justified.